[Nos. 18319-6-II; 18320-0-II; Division Two. March 22, 1996.] 19085-1-II.

*In the Matter of the Detention of J.R.*

MOHEBAT SABETI, M.D., ET AL., *Appellants*, v. J.R., *Respondent.*

*In the Matter of the Detention of W.B.*

MOHEBAT SABETI, M.D., ET AL., *Appellants*, v. W.B., *Respondent.*

*In the Matter of the Detention of G.R.*

G.R., *Appellant*, v. ROGER JACKSON, M.D., ET AL., *Respondents.*

*Christine O. Gregoire, Attorney General,* and *Linda A. Sullivan, Assistant,* for appellants Sabeti and Slone.

*Maureen A. Cavanaugh,* for appellant G.R. and respondents J.R. and W.B.

*Christine O. Gregoire, Attorney General,* and *Sarah J. Coats, Assistant,* for respondents Jackson and Johnston.

SEINFELD, C.J. — Three patients at Western State Hospital, J.R., W.B., and G.R., challenge their commitments to an additional 180 days of confinement.[1] Each claims the petition for commitment was defective because the psychiatrist signing it was not an "examining" psychiatrist, as that term is used in RCW 71.05.320. We conclude

---

[1] We consolidated these three cases on appeal.

that a treating doctor who has made frequent, ongoing, and recent observations of the patient can qualify as an "examining" psychiatrist. We further conclude that a trial court, upon determining that a petitioning psychiatrist does not qualify as an "examining" psychiatrist, has the discretion to dismiss a petition for commitment without prejudice.

## FACTS

In 1984, Dr. Mohebat Sabeti, a psychiatrist, and Dr. Donald G. Slone, a psychologist, petitioned to commit J.R., a patient at Western State Hospital, to an additional 180 days of confinement. In their supporting affidavit, they stated that J.R. had been diagnosed with dementia and that the disease impaired J.R.'s cognitive, behavioral, and self-care functions. They described J.R. as severely impaired and completely unable to provide for his needs, requiring assistance in feeding, toileting, and grooming. They also said that J.R. exhibited assaultive behavior that would interfere with his placement in an extended care facility.

The same two doctors also petitioned to commit W.B. to an additional 180 days of confinement. W.B.'s diagnosis also was dementia and impaired cognitive functioning. He requires full care to meet his essential daily needs — feeding, toileting, and grooming. The doctors described W.B. as frequently and unpredictably assaultive towards staff and peers, resistant to care, and verbally abusive. As with J.R., W.B.'s assaultive behavior is incompatible with placement in an extended care facility.

At the hearing on J.R.'s petition, Dr. Slone testified; Dr. Sabeti did not. Dr. Slone stated that Dr. Sabeti's last formal evaluation of J.R. occurred on April 4, 1994, 21 days before Dr. Sabeti signed the petition. Dr. Slone testified that he believed that it was Dr. Sabeti's practice to conduct monthly formal evaluations, supplemented by daily evaluations based on Sabeti's observation of and

contact with the patient during his two daily visits. He opined that because Dr. Sabeti was familiar with J.R.'s condition — his appearance, hygiene, manner, attitude, orientation, memory, communication ability, volitional control and history of assaultive behavior — Sabeti could form an accurate diagnosis and make a placement determination.

In W.B.'s case, both doctors testified. Dr. Slone stated that W.B. had refused assessment on numerous occasions. Nonetheless, Dr. Slone had observed W.B., reviewed his chart, and spoken with his treatment team in order to form a diagnosis. Dr. Sabeti testified that he sees each of 27 to 32 patients on the ward twice daily, spending about a total of 15 minutes per day with each one. During this time he assesses the changes, if any, in the patient's behavior and notes any medication changes in the patient's chart. Dr. Sabeti stated that he was aware of W.B.'s appearance, hygiene, manner, attitude, orientation, memory, speech, ability to communicate, thought processes, content disorders, perceptions of reality, judgment, insight, cognitive or volitional control and history of assaultiveness.

In both cases, the court commissioner presiding over the hearing dismissed the petitions because there was no evidence that Dr. Sabeti had conducted a formal mental status examination for purposes of the court proceeding. The State appeals the dismissals.

The third case involves G.R., whose diagnosis is chronic undifferentiated schizophrenia. Dr. Roger Jackson, a psychiatrist, and Dr. George Johnston, a psychologist, jointly petitioned to commit G.R. for an additional 180 days of confinement, and both signed a supporting affidavit confirming the need for the commitment.

G.R. has a history of mental illness and suffers from disorientation, auditory hallucinations, and impaired memory and judgment. He was transferred to Western State Hospital because of his extreme assaultive behavior, and he assaulted staff and peers during his hospitaliza-

tion. Physical restraints were necessary to prevent additional assaults. This assaultive behavior prevents him from being a candidate for an extended care facility.

At G.R.'s hearing, both Drs. Johnston and Jackson testified. Dr. Johnston based his diagnosis of schizophrenia on his observations of G.R.'s behavior, review of his clinical records, and evaluation of G.R.'s mental condition. He testified that most of the time G.R. is too psychotic to manage his own behavior and is likely to harm others due to his unpredictable and aggressive behavior.

Dr. Jackson testified that he had been covering for another psychiatrist for the two-week period preceding the hearing. During that time he observed G.R. briefly each day while visiting the unit. These visits were sufficient to permit him to concur with Dr. Johnston's diagnosis. Dr. Jackson found G.R. to exhibit disorganized thought processes, suspiciousness and anger.

The court commissioner concluded that there was no evidence that Dr. Jackson had examined G.R. for purposes of the hearing. Because G.R.'s current period of hospitalization had not yet expired, the court commissioner dismissed the petition without prejudice after the State rested.[2] G.R. appeals the dismissal without prejudice.

On appeal, we discuss the following issues: (1) As this matter is moot, is review appropriate? (2) In the case of G.R., did the court commissioner abuse her discretion in dismissing the matter without prejudice? (3) Does RCW 71.05.320 require a separate formal examination of the patient in support of the 180-day commitment petition?

I

MOOTNESS

The detentions that are the subjects of this appeal have long since ended, making these appeals moot. Nonethe-

---

[2]The State later presented another petition for G.R.'s hospitalization. At the conclusion of the hearing on that petition, the court commissioner found that G.R. was gravely disabled and presented a serious harm to others and granted the petition.

less, the parties ask us to accept review, arguing that these cases involve matters of continuing and substantial public interest. *In re G.V.*, 124 Wn.2d 288, 294, 877 P.2d 680 (1994).

■■ The need to clarify the civil commitment statute is a matter of continuing and substantial public interest. *G.V.*, 124 Wn.2d at 294; *In re LaBelle*, 107 Wn.2d 196, 200, 728 P.2d 138 (1986); *Dunner v. McLaughlin*, 100 Wn.2d 832, 838, 676 P.2d 444 (1984). Further, as individual liberty interests are involved in any involuntary commitment action, due process concerns indicate a need for clarification. Finally, the situation giving rise to the issues presented here is likely to reoccur. Thus, an authoritative decision will provide guidance for future cases. Based on these considerations, we accept review.

## II

### DISMISSAL WITHOUT PREJUDICE

■■ A plaintiff, after resting his case, may move for a voluntary dismissal, without prejudice, upon showing of good cause and upon such terms and conditions as the court deems proper. CR 41(a)(2). We review a decision granting a voluntary dismissal for abuse of discretion. *Jackson v. Standard Oil Co.*, 8 Wn. App. 83, 103, 505 P.2d 139 (1972), *review denied*, 82 Wn.2d 1001 (1973). Abuse occurs when the trial court's ruling is manifestly unreasonable or discretion was exercised on untenable grounds. *In re Schuoler*, 106 Wn.2d 500, 512, 723 P.2d 1103 (1986) (citing *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971)). This determination depends upon " 'the comparative and compelling public or private interests of those affected by the order or decision and the comparative weight of the reasons for and against the decision.' " *Schuoler*, 106 Wn.2d at 512 (quoting *Carroll*, 79 Wn.2d at 26).

Chapter 71.05 RCW identifies the following compelling public interests related to civil commitment procedures:

(2) To provide prompt evaluation and short term treatment of persons with serious mental disorders;

. . . .

(4) To provide continuity of care for persons with serious mental disorders;

. . . .

(7) To protect the public safety.

RCW 71.05.010; *G.V.*, 124 Wn.2d at 295.

After weighing the public interests against the private interests of the patients affected, the *G.V.* court concluded that a continuance would not compromise the interests of either group. *G.V.*, 124 Wn.2d at 296. The court noted that the patients were under prior commitment orders that would not expire before a new hearing could be held. *G.V.*, 124 Wn.2d at 296.

G.R.'s case is the same. At the time of the dismissal without prejudice, approximately 10 days remained before the expiration of his prior commitment order. Thus, there was time to conduct another hearing before G.R.'s release date. Moreover, as in *G.V.*, the issue at the time of the dismissal was not G.R.'s right to be released. Rather, the question was whether the doctors had properly examined him for the purpose of the commitment hearing.

Both doctors testified that G.R. could not care for himself and that because of his assaultiveness, he presented a risk of harm to others. The record supports the conclusion that the impact on G.R.'s rights was slight, while the public interest in providing care, treatment, and protection was great. The court commissioner did not abuse her discretion in granting the dismissal without prejudice.

## III

### SEPARATE EXAMINATIONS

J.R., W.B., and G.R. contend that the civil commitment statute requires that the "examining" doctor who signs

the petition must conduct a formal mental status examination of the patient to support the facts in the doctor's affidavits and to support his commitment hearing testimony. They rely solely on the language of RCW 71.05.290(2) for their contention. The statute provides:

> (2) The petition shall summarize the facts which support the need for further confinement and shall be supported by affidavits signed by two *examining* physicians, or by one *examining* physician and *examining* mental health professional. The affidavits shall describe in detail the behavior of the detained person which supports the petition and shall explain what, if any, less restrictive treatments which are alternatives to detention are available to such person, and shall state the willingness of the affiant to testify to such facts in subsequent judicial proceedings under this chapter.

RCW 71.05.290(2) (emphasis added).

 Although section .290 explicitly applies to 14-day commitments, the overall scheme of RCW 71.05 suggests that it also applies to 180-day commitments. The statute does not specifically discuss the procedural requirements for a 180-day commitment period. However, RCW 71.05.320(2) authorizes commitment for an additional 180 days of treatment: "At the end of the one hundred eighty day period of commitment, the committed person shall be released unless a petition for another one hundred eighty day period of continued treatment is filed and heard in the same manner as provided herein above." We interpret this language to require compliance with the requirements contained in section RCW 71.05.290(2).

 The issue before us, then, is the meaning of the term, "examining" physician. In construing statutes, courts attempt to give effect to the plain meaning of the words used by the Legislature, reading the statute as a whole, not piecemeal. *State v. Sommerville*, 111 Wn.2d 524, 531, 760 P.2d 932 (1988). Where the Legislature uses certain language in one section, and different language in

another section, there is different legislative intent. *In re Swanson*, 115 Wn.2d 21, 27, 793 P.2d 962, *amended*, 804 P.2d 1 (1990). As civil commitment statutes authorize a significant deprivation of liberty, they must be strictly construed. *Swanson*, 115 Wn.2d at 27; *LaBelle*, 107 Wn.2d at 205.

In RCW 71.05.210, the Legislature used the past tense of the verbs "examine" and "evaluate," thereby clearly mandating that the hospital conduct an examination: "Each person involuntarily admitted to an evaluation and treatment facility shall, within twenty-four hours of his or her admission, be *examined* and *evaluated* by a licensed physician." RCW 71.05.210 (emphasis added). However, in RCW 71.05.290 the Legislature chose the present participle form of the verb "examine," indicating a different intent. Here, the verb form is used as an adjective to modify the noun "physician" or "mental health professional." Adjectives more completely describe the nouns they modify; they are not nouns. We would need to treat the word "examining" as a noun in order to interpret it as requiring a separate examination. Moreover, the present participle form, "examining," connotes a continuing process or activity, not one that has a finite beginning and end.

 Pursuant to this interpretation, a doctor who previously has examined a patient, who maintains frequent contact with the patient, and who has extensive current knowledge about the patient's mental status may qualify as an examining doctor and share his information with the court by means of the petition. A patient who is being evaluated for a second 180-day commitment period generally has been in the hospital for at least the previous six and one-half months (one 14-day and one 180-day commitment period). RCW 71.05.230; 71.05.320. Thus, the treating doctor has had a unique opportunity to evaluate the patient and may have a more thorough understanding of the patient than would a doctor who merely conducts a single, isolated, mental status examination. To find the

latter qualified to petition the court, but not the former, could frustrate the goal of providing the court access to the most reliable evidence available.

Defining "examining" physician to include a treating doctor who is familiar with the patient by way of ongoing informal examinations is consistent with the language of the statute; examining suggests an ongoing, continuing, comparative process. It also serves the statutory objectives of avoiding inappropriate commitments, providing "continuity of care for persons with serious mental disorders," and "prevent[ing] duplication of services and unnecessary expenditures." RCW 71.05.010(1), (4), and (5).

In the cases of J.R. and W.B., both the treating psychologists and psychiatrists testified that they had daily contact with each patient, prepared periodic formal evaluations, and evaluated them continually and constantly. Thus, those doctors satisfied the definition of "examining" professional, as used in RCW 71.05.290.

Although we conclude that a treating doctor may qualify as an examining doctor, we do not minimize the need for meaningful protection of the patients' liberty interests. The statute provides protection by requiring that the petitioning doctor be personally familiar, in detail, with the patient's illness and prognosis. If, at the commitment hearing, the testimony reveals that the treating doctor lacks sufficient first-hand familiarity with the patient's mental status to make a diagnosis and recommendation, the appropriate remedy is dismissal of the petition.

That is precisely what the court commissioner did in the case of G.R. Dr. Jackson evaluated G.R. only cursorily; he had less than two weeks of contact and the contacts were for very brief periods of time. Dr. Jackson had not conducted any type of examination or evaluation in the past that could serve as a baseline for a continuing evaluation process. In light of these minimal contacts, the court commissioner did not err in concluding that Dr. Jackson did not qualify as an "examining" physician and, thus, in dismissing the petition.

We reverse the dismissals of the petitions regarding J.R. and W.B. and affirm the dismissal without prejudice of the petition regarding G.R.

HOUGHTON and ARMSTRONG, JJ., concur..

Reconsideration denied April 18, 1996.

Review denied at 130 Wn.2d 1003 (1996).