[Nos. 40372-9-I; 40373-7-I; Division One. May 18, 1998.]
40560-8-I.

*In the Matter of the Detention of* A.S.

A.S., *Appellant*, v. THE STATE OF WASHINGTON,
*Respondent.*

*In the Matter of the Detention of* E.L.

E.L., *Appellant*, v. THE STATE OF WASHINGTON,
*Respondent.*

*In the Matter of the Detention of* C.M.

C.M., *Appellant*, v. THE STATE OF WASHINGTON,
*Respondent.*

*Eric Broman* and *Jonathan T. Stier* of *Nielsen, Broman & Associates, P.L.L.C.*, for appellants.

*K. Garl Long, Prosecuting Attorney*, and *Erik Pedersen, Deputy*, for respondent.

ELLINGTON, J. — A.S., E.L., and C.M. appeal from respective orders detaining them for up to 14 days of involuntary treatment. A.S. and E.L. contend the petitions filed in their cases were defective and should have been dismissed because they were not cosigned by a physician. All three appellants argue that the social worker who testified at each of their probable cause hearings was not qualified to render an expert opinion concerning their respective psychiatric conditions and that the trial court erred in admitting his testimony. E.L. and C.M. also assert that the trial court's factual findings that E.L. presented a likelihood of serious harm to herself and that C.M. was gravely disabled were not supported by substantial evidence. We disagree and affirm.

## Facts

### A.S.

A.S. was taken into emergency custody at North Sound Evaluation and Treatment Facility (North Sound E&T)

on March 11, 1997.[1] On March 14, 1997, a petition for 14-day involuntary treatment was filed, alleging that A.S. was gravely disabled. The petition was signed by the court liaison for North Sound E&T, Bruce Work, M.S.W., but was not co-signed by a physician. The physician on staff at North Sound E&T, Dennis Gaither, had previously examined A.S., but on the day the petition was filed, Dr. Gaither was absent from work due to illness and was not able to sign the petition.

Another physician, Kathryn Neracs, was asked to travel from Seattle to North Sound E&T to evaluate A.S. Dr. Neracs did not arrive at North Sound E&T until late in the afternoon. In the meantime, the deputy prosecuting attorney instructed Mr. Work, because of the late hour, to file the petition without a physician's signature. Although Dr. Neracs examined A.S. on the day the petition was filed (Friday, Mar. 14, 1997), her affidavit was not filed until the following Monday. In her affidavit, Dr. Neracs opined that A.S. had "mild dementia and significant delusions" and needed "further hospitalization to clarify his psychiatric diagnosis and stabilize him physically and psychologically."

The trial court held a probable cause hearing on March 17, 1997. At the hearing, Bruce Work testified that he believed A.S. suffered from a mental disorder, namely Psychotic Disorder NOS,[2] and that, as a result of this disorder, A.S. was gravely disabled. Mr. Work explained that, in forming this opinion, he had consulted with Dr. Gaither

---

[1]The day after his admission to North Sound E&T, A.S. developed a fever and was transferred to a hospital, where he was diagnosed with a urinary tract infection. A.S. remained at the hospital until March 14, 1997, at which time he was transferred back to North Sound E&T. Due to A.S.'s hospitalization, North Sound E&T requested and was granted, pursuant to RCW 71.05.210, a one-day continuance of the 72-hour probable cause hearing.

[2]The category "Psychotic Disorder Not Otherwise Specified" includes "psychotic symptomatology (i.e., delusions, hallucinations, disorganized speech, grossly disorganized or catatonic behavior) about which there is inadequate information to make a specific diagnosis or about which there is contradictory information, or disorders with psychotic symptoms that do not meet the criteria for any specific Psychotic Disorder." AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS § 298.9 at 315 (4th ed. 1994).

and the staff at North Sound E&T and had reviewed A.S.'s chart. Mr. Work further testified that he saw evidence of repeated loss of cognitive and volitional control and that, because A.S. was in denial of any problems, no less restrictive alternatives to involuntary treatment existed.

Mr. Work has a Master of Social Work degree, with a psychiatric specialty, and 17 years of experience in the mental health field. A.S.'s counsel objected to Mr. Work's testimony on the grounds that Mr. Work did not have a graduate degree in psychology and was not permitted by law to prescribe medication. The trial court overruled the objection. At the conclusion of the hearing, the trial court found by a preponderance of the evidence that A.S. suffered from a mental disorder and was gravely disabled. The trial court further concluded that no less restrictive alternatives to 14-day involuntary treatment existed, and subsequently entered an order of detention, from which A.S. now appeals.

E.L.

E.L. was taken into emergency custody on March 12, 1997. On that day, police responded to a 911 call from E.L.'s home. The call was placed by a friend of E.L.'s roommate, to whom E.L. had made threats of suicide. After police and a county designated mental health professional arrived at the home, E.L. refused to talk, then grabbed a knife, went to her bedroom, and attempted to slit her wrist. The knife was eventually wrestled away from E.L., and she was detained at North Sound E&T for 72 hours on the ground that she posed a danger to herself.

On March 14, 1997, a petition for 14-day involuntary treatment was filed, alleging that E.L. presented a likelihood of serious harm to herself. The petition was signed by Bruce Work, but was not cosigned by a physician for the same reason as in A.S.'s case, i.e., Dr. Gaither's illness and absence from work. As in A.S.'s case, Dr. Neracs evaluated E.L. on the day the petition was filed, but her affidavit was not filed until the following Monday, March 17, 1997. In her affidavit, Dr. Neracs stated that E.L. was being given

the antidepressant Prozac® (fluoxetine hydrochloride), but the medication required time to take effect, and E.L. remained very depressed and continued to have suicidal ideation. Dr. Neracs opined that E.L. needed "longer hospitalization for further stabilization of her symptoms."

The trial court held a probable cause hearing on March 17, 1997. At the hearing, Joan Lubbe, a psychiatric counselor at North Sound E&T, testified that, on the morning of Saturday, March 15, 1997, she observed E.L. sawing on her arm with a comb. According to Ms. Lubbe, E.L. sawed so vigorously with the comb that all its teeth had broken off, leaving red marks on her wrist. Bruce Work testified, over the objection of E.L.'s counsel, that he had consulted with Dr. Gaither and reviewed E.L.'s chart, and had concluded that E.L. suffered from a mental disorder, namely Psychotic Disorder NOS. Mr. Work opined that, as a result of her mental disorder, E.L. presented a likelihood of serious harm to herself. He based this opinion on an interview with E.L. during which she had "difficulty staying on track and discussing the present," her statements revealed a "sense of hopelessness and helplessness," and she expressed a desire to "sleep forever." Mr. Work further opined that no less restrictive alternatives to involuntary treatment existed, given E.L.'s failure to follow up on previous occasions with mental health providers and her level of depression and suicidal ideation.

The trial court found by a preponderance of the evidence that E.L. suffered from a mental disorder and that, in light of her recent overt act with the comb and suicidal statements, she presented a likelihood of serious harm to herself. The trial court further concluded that no less restrictive alternatives to 14-day involuntary treatment existed, and subsequently entered an order of detention, from which E.L. now appeals.

C.M.

C.M. was taken into emergency custody at North Sound E&T on March 19, 1997. On March 20, 1997, a petition for 14-day involuntary treatment was filed, alleging that C.M.

was gravely disabled. The petition was signed by both Dr. Gaither and Bruce Work. In addition, Dr. Gaither submitted an affidavit stating that C.M. suffered from Psychotic Disorder NOS and that less restrictive settings would not be appropriate at that time.

On March 21, 1997, a probable cause hearing was held, at which C.M.'s mother, Bruce Work, and C.M. testified. C.M.'s mother testified that, in February 1997, C.M. traveled to California and then began traveling around the country, calling her periodically from a new location. In mid-March 1997, she arranged for an airplane ticket for C.M. to return to the Seattle area. When he arrived in Seattle, his mother noticed that C.M. had lost weight and was "not well kept." She took C.M. to her house, where he was staying until he was taken into emergency custody.

During the few days C.M. was at her house, C.M.'s mother observed him standing in the middle of a room, moving his mouth as though he was talking, but not making any sounds. In addition, during this period, C.M. spoke about people being "after him" and about talking or being monitored through satellites and radio and TV waves. On March 19, 1997, C.M.'s mother locked C.M. out of the house and told him that she was not going to let him back in the house until he agreed to get medication.[3] It was cold and raining, but C.M. did not take shelter under the eaves of the house; rather, he stood in the middle of the patio or the driveway for approximately two hours. Eventually, C.M. climbed onto the roof of the house and began running around, hitting skylights, jumping up and down, and screaming. At that point, his mother called the police, but when they arrived, C.M. had disappeared.

Bruce Work testified, over the objection of C.M.'s counsel, that he had consulted with Dr. Gaither, reviewed C.M.'s chart, and evaluated C.M., and, as a result, believed that C.M. suffered from a mental disorder. Mr. Work recounted

[3]C.M.'s mother testified that C.M. had been diagnosed with Bipolar Disorder and that lithium had been prescribed for him, but that he had not been taking his medication.

a conversation in which C.M. claimed he had a pager that communicated with a satellite that could see him wherever he was, even inside buildings. Mr. Work observed that C.M. was difficult to understand because he spoke rapidly and leaped from one subject to the next. Mr. Work also informed the court that he had spoken with one of C.M.'s friends, with whom C.M. believed he could stay, and that she had responded "absolutely not . . . staying there was not an option." Mr. Work opined that, as a result of his mental disorder, C.M. was gravely disabled in that he manifested severe deterioration in routine functioning and escalating loss of volitional control. Mr. Work further opined that, given C.M.'s denial of his mental disorder and lack of quality places to stay, he would not receive the care essential for his health and safety if released and that no less restrictive alternatives to involuntary treatment existed.

C.M. testified that he knew how to access homeless shelters and the YMCA and that he thought he could stay with friends in West Seattle. He further testified that he had a primary care physician, knew where the doctor's office was located, and was able to travel there by bus. On cross-examination, C.M. explained that he had been on the roof of his mother's house trying to fix the gutter and, when the police arrived, he "just walked right past them."

The trial court found by a preponderance of the evidence that C.M. suffered from a mental disorder and was gravely disabled. The trial court further concluded that no less restrictive alternatives to 14-day involuntary treatment existed, and subsequently entered an order of detention, from which C.M. now appeals.

## Mootness

■■ As a preliminary matter, we must first address the State's contention that these cases are moot. In general, when a case involves only moot questions or abstract propositions, the appeal should be dismissed. *Sorenson v. City of Bellingham*, 80 Wn.2d 547, 558, 496 P.2d 512 (1972). A widely recognized exception to this general rule lies

within the court's discretion when the case concerns "matters of continuing and substantial public interest." *E.g.,* *Dunner v. McLaughlin,* 100 Wn.2d 832, 838, 676 P.2d 444 (1984). Since *McLaughlin,* this exception has been expressly invoked in at least six published cases involving application of the statutory civil commitment scheme. *In re Detention of R.S.,* 124 Wn.2d 766, 881 P.2d 972 (1994); *In re Detention of Swanson,* 115 Wn.2d 21, 793 P.2d 962, 804 P.2d 1 (1990); *In re Detention of LaBelle,* 107 Wn.2d 196, 728 P.2d 138 (1986); *In re Detention of J.R.,* 80 Wn. App. 947, 912 P.2d 1062, *review denied,* 130 Wn.2d 1003, 925 P.2d 989 (1996); *In re Detention of Kirby,* 65 Wn. App. 862, 829 P.2d 1139 (1992); *In re Detention of Chorney,* 64 Wn. App. 469, 825 P.2d 330 (1992). In each of these cases, the courts have recognized that clarification of the statutory scheme governing civil commitment is a matter of "continuing and substantial public interest." *R.S.,* 124 Wn.2d at 770; *Swanson,* 115 Wn.2d at 25; *LaBelle,* 107 Wn.2d at 200; *J.R.,* 80 Wn. App. at 953; *Kirby,* 65 Wn. App. at 866; *Chorney,* 64 Wn. App. at 474.

The State argues that the criteria for determining whether a sufficient public interest exists have not been met in any of these linked cases. The three factors to be considered are: (i) whether the issue is of a public or private nature; (ii) whether an authoritative determination is desirable to provide future guidance to public officers; and (iii) whether the issue is likely to recur. *E.g., Hart v. Department of Soc. & Health Servs.,* 111 Wn.2d 445, 448, 759 P.2d 1206 (1988). The State contends that the absence of a physician's signature on these petitions for 14-day involuntary treatment arose from unusual circumstances that are not likely to recur. The State further argues that any decision by this court regarding the admissibility of Mr. Work's testimony and the sufficiency of the evidence would be limited to the facts of each case and therefore would not provide future guidance to public officers.

The State's arguments are unconvincing in light of the policy concerns associated with involuntary commitment. In enacting the statute governing civil commitment, the

Legislature expressly stated the goals of ending inappropriate commitment of mentally disordered persons and safeguarding individual rights. RCW 71.05.010(1) and (3). In keeping with these goals, the act imposes a detailed set of procedural safeguards at each stage of involuntary confinement. *McLaughlin*, 100 Wn.2d at 840. To the extent a petition or hearing allegedly fails to comply with these statutory requirements, whether as the result of rare or common circumstances, the issue is of public concern and clarification by the judiciary is desirable. In addition, we are not convinced that the circumstance of a physician's illness and inability to cosign a petition is never likely to recur, or that the adequacy an expert's qualifications constitutes an isolated matter needing no guidance in the future. We thus address the merits of these cases.

## Civil Commitment Scheme

Under the Washington civil commitment scheme, a person may be initially detained for evaluation and treatment through either of two procedures: (i) petition by a county designated mental health professional (CDMHP) and order by a superior court; or (ii) emergency custody by a CDMHP or on his or her oral or written order. RCW 71.05.150(1) and (2). The CDMHP must file and serve a Notice of Emergency Detention on the first judicial day following the initial detention. RCW 71.05.160. The initial detention may not exceed 72 hours from the time of acceptance by an evaluation and treatment facility.[4] RCW 71.05.180; *see Swanson*, 115 Wn.2d at 33.

The evaluation and treatment facility or CDMHP may petition for additional confinement of up to 14 days of involuntary intensive treatment or 90 days of a less restrictive alternative. RCW 71.05.230. The petition must be signed by either two physicians or by one physician and a mental health professional who have examined the person.

---

[4]This 72-hour period excludes Saturdays, Sundays, and holidays. RCW 71.05.180.

RCW 71.05.230(4). A probable cause hearing on the petition must be held within 72 hours of the initial detention.[5] RCW 71.05.240.

At the conclusion of the probable cause hearing, if the court finds by a preponderance of the evidence that the person, as the result of mental disorder, presents a "likelihood of serious harm" or is "gravely disabled," the court may order the person to undergo up to 14 days of involuntary treatment or up to 90 days of a less restrictive alternative, depending on what the court determines is in the best interests of the person or others. RCW 71.05.240. Beyond the first 14-day period of intensive inpatient treatment, the person may not be detained unless a petition for additional confinement is filed and another probable cause hearing is held. The statutory provisions relating to confinement beyond the first 14-day period are not at issue here.

### Defective Petitions

■■ Appellants A.S. and E.L. contend that the petitions filed in their cases were defective because they were not co-signed by a physician as required by RCW 71.05.230(4), and that the trial court erred in denying their motions to dismiss on this ground.[6] The State concedes that the petitions as filed were defective, but counters that the defect at issue was not fatal because (i) an examining physician filed affidavits supporting the petitions within the applicable 72-hour period; (ii) when appellants moved to dismiss the respective petitions, the State still had time on the 72-hour clock to file corrected petitions, and thus, appellants suffered no prejudice; and (iii) dismissal of the petitions and release of A.S. or

---

[5]The probable cause hearing may be postponed for up to 48 hours, if requested by the detained person, or 24 hours, if requested by the State and upon a showing of good cause. RCW 71.05.240.

[6]The motions to dismiss involved pure questions of law for which the standard of review is de novo. *Womble v. Local Union 73, Int'l Bhd. of Elec. Workers*, 64 Wn. App. 698, 700, 826 P.2d 224, *review denied*, 119 Wn.2d 1018, 838 P.2d 691 (1992); *see In re Detention of R.P.*, 89 Wn. App. 212, 214, 948 P.2d 856 (1997).

E.L. would not have furthered the objectives of the civil commitment statute.[7]

■ ■ The State's arguments are persuasive. Although the civil commitment statute must be strictly construed because it involves a significant deprivation of liberty, the spirit and intent of the law should prevail over the letter of the law so as to avoid strained or absurd consequences. *LaBelle*, 107 Wn.2d at 205. In these cases, failure to obtain a physician's signature on the petitions for 14-day involuntary treatment was a matter of form only. In both cases, the probable cause hearing was held within the applicable 72-hour period.[8] Prior to each probable cause hearing, affidavits of an examining physician were filed and served

---

[7]The State's arguments that the defects in the petitions were harmless can succeed only if the statutory requirements for petitions are not jurisdictional in nature. None of the parties has briefed this issue and it appears to be one of first impression. The civil commitment statute does not expressly define the point at which the trial court's jurisdiction attaches, but in light of the statutory scheme, the court must be deemed to acquire jurisdiction sometime prior to the filing of a petition for 14-day involuntary treatment. Although the petition is on a 72-hour clock, the detained person has rights that may be invoked prior to the expiration of the 72-hour period. For example, the detained person has the right to be examined and evaluated within 24 hours of admission and the right to refuse all but emergency lifesaving treatment beginning 24 hours before the 72-hour probable cause hearing. RCW 71.05.210. These rights would be unenforceable if the trial court lacked jurisdiction during the 72-hour period preceding the filing of a petition. In addition, prior to the filing of a petition for 14-day involuntary treatment, the court may order a continuance of the 72-hour probable cause hearing for a period not to exceed 14 days if, as a result of his or her physical condition, the detained person requires hospitalization. *Id.* Thus, the petition cannot be viewed as conferring jurisdiction on the trial court. Rather, the statutory scheme supports the conclusion that the trial court acquires jurisdiction upon the detained person's provisional acceptance by an evaluation and treatment facility. *See Swanson*, 115 Wn.2d at 25 ("The parties agree that the trial court had both personal and subject matter jurisdiction in this case up until the 72-hour period expired."); *see also* RCW 71.05.170; *Swanson*, 115 Wn.2d at 33 ("'[T]he 72-hour period begins upon a facility's immediate provisional acceptance of a petition and person for detention."). Thus, we conclude the statutory requirements for a petition for 14-day involuntary treatment are not jurisdictional in nature.

[8]In A.S.'s case, the State was granted a continuance of the probable cause hearing due to A.S.'s hospitalization. A.S. does not assign error to the trial court's grant of this continuance. *See* RCW 71.05.210 ("An evaluation and treatment center admitting any person pursuant to this chapter whose physical condition reveals the need for hospitalization shall assure that such person is transferred to an appropriate hospital for treatment. . . . [T]he court shall order such continuance in proceedings under this chapter as may be necessary, but in no event may this continuance be more than fourteen days.").

on appellants' trial counsel. In each case, the examining physician's affidavit stated that further inpatient treatment was required and provided factual support for this conclusion. Thus, these affidavits effectively cured the defect in the petitions.[9]

■ In addition, appellants demonstrate no prejudice from the trial court's refusal to dismiss the petitions. At the time appellants raised the issue, the State had sufficient time to file corrected petitions and conduct another probable cause hearing. Thus, the trial court could have simply dismissed the defective petitions without prejudice to refile. *See J.R.*, 80 Wn. App. at 953-54 (trial court's grant of voluntary dismissal without prejudice was not an abuse of discretion when time remained to conduct a new hearing). In light of the timely filed affidavits, we find no error in the trial court's refusal to force the State to reinitiate these proceedings.

### Testimony of Social Worker

■■ All three appellants assign error to the trial court's consideration of the testimony of Bruce Work, contending he lacked the qualifications necessary to testify as an expert witness concerning their respective mental conditions. We find appellants' arguments unconvincing. ER 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Whether a person is qualified to testify as an expert witness is within the sound discretion of the trial court. *Oliver v. Pacific NW Bell Tel. Co.*, 106 Wn.2d 675, 683, 724 P.2d 1003 (1986). The decision to admit or exclude expert

---

[9]We would reach a different result in the absence of these timely filed affidavits. *Cf. R.P.*, 89 Wn. App. at 217 (affirming the trial court's dismissal of a 180-day petition that the State had failed to support with the requisite affidavits).

testimony will not be disturbed on appeal unless a manifest abuse of discretion is shown. *Id.*

■■■■ Appellants appear to contend that Mr. Work's testimony was inadmissible per se because he is not a physician or psychologist. Appellants cite no statutory provision requiring the testimony of a physician or psychologist, or excluding or limiting the testimony of a social worker, at a probable cause hearing. Rather, appellants argue that, because Mr. Work is not a physician or psychologist, he could not have opined about their respective mental conditions with the requisite "reasonable medical and psychological certainty," citing *In re Detention of Twining*, 77 Wn. App. 882, 894 P.2d 1331, *review denied*, 127 Wn.2d 1018, 904 P.2d 299 (1995).

In *Twining*, the Court observed that "[e]xpert opinion testimony concerning a person's mental status is not admissible unless the expert holds his or her opinion with reasonable medical and psychological certainty." *Id.* at 891. Appellants misconstrue this standard, which does not measure the expert's qualifications, but rather the correlation between the facts and the expert's opinion. *See id.* at 891-93 (equating "reasonable medical certainty" with "more likely than not"); *State v. Martin*, 14 Wn. App. 74, 76-77, 538 P.2d 873 (1975), *review denied*, 86 Wn.2d 1009 (1976) (delineating an expert's qualifications as a criterion separate from "reasonable medical certainty" in evaluating the admissibility of the expert's testimony); *see also State v. Tyler*, 77 Wn.2d 726, 756-59, 466 P.2d 120 (1970), *judgment vacated in part on other grounds*, 408 U.S. 937, 92 S. Ct. 2865, 33 L. Ed. 2d 756 (1972) (testimony of two psychiatrists regarding defendant's diminished capacity as a result of intoxication was properly excluded as lacking in "reasonable medical certainty" because the psychiatrists did not examine defendant within the relevant time period and did not know what kinds, amounts, or intervals of drugs defendant allegedly consumed); *State v. Terry*, 10 Wn. App. 874, 884, 520 P.2d 1397 (1974) (testimony of pathologist, who exhibited confusion concerning the meaning of "rea-

sonable medical certainty" and would only testify as to the "more probable than not" cause of death, satisfied the standard).

In addition, appellants' contention that a social worker's testimony cannot satisfy the "reasonable medical and psychological certainty" standard runs counter to the Legislature's express recognition of the expertise possessed by social workers, who are included within the definition of "mental health professional," RCW 71.05.020(14), and are therefore authorized to assist in the evaluation[10] and treatment of a detained person, RCW 71.05.210, and to cosign a petition for 14-day involuntary treatment, RCW 71.05.230(4). A social worker with the requisite experience is also eligible for appointment as a CDMHP, in which event the social worker would have the authority (without consulting a physician or psychologist) to take or order a person into emergency custody. RCW 71.05.150(2); WAC 275-55-020(6). Finally, to the extent appellants' view would always require either a physician or psychologist to testify at a 72-hour probable cause hearing, it is inconsistent with the intent of the civil commitment statute, which seeks to encourage the full use of professional personnel and prevent unnecessary expenditure. RCW 71.05.010(5). Thus, we reject appellants' contention that Mr. Work's testimony was inadmissible per se.

■■■ To the extent appellants argue that Mr. Work's particular professional schooling and experience were insufficient to qualify him as an expert, we disagree. We emphasize that the determination whether an individual is

---

[10]Appellant A.S. implies that, in evaluating the mental condition of A.S., Mr. Work engaged in the unlicensed practice of medicine, citing RCW 18.71.011, which defines the practice of medicine to include the diagnosis of mental conditions. We disagree. RCW 71.05.210 specifically permits a mental health professional like Mr. Work to assist in the evaluation and treatment of an involuntarily detained person. In addition, the Legislature has promulgated separate rules governing counseling, pursuant to which persons who are not licensed to practice medicine are nevertheless authorized to diagnose and treat mental and emotional disorders. RCW 18.19.110(3) (certified social worker); RCW 18.19.120(2) (certified mental health counselor); RCW 18.19.130(2) (certified marriage and family therapist).

qualified to offer expert testimony lies within the trial court's sound discretion. Mr. Work has a Master of Social Work degree, with a psychiatric specialty, and 17 years of experience in the mental health field. The record reflects that, prior to testifying, Mr. Work consulted with Dr. Gaither, reviewed the charts, and conducted an interview with each appellant. Mr. Work therefore had sufficient familiarity with appellants' respective conditions to hold his opinion with reasonable medical and psychological certainty. Appellants offered no evidence, through either direct testimony or cross-examination of Mr. Work, that Mr. Work's opinion differed in any regard from that of Dr. Gaither or Dr. Neracs or from the information in appellants' respective charts. The trial court's decision to admit Mr. Work's testimony was not an abuse of discretion. *Compare State v. McDonald*, 89 Wn.2d 256, 268-69, 571 P.2d 930 (1977), *overruled on other grounds by State v. Sommerville*, 111 Wn.2d 524, 760 P.2d 932 (1988) (psychiatric social worker with 3 1/2 years of clinical experience was qualified to provide expert testimony about the defendant's sanity).

## Sufficiency of Evidence

Appellants E.L. and C.M. challenge the trial court's factual findings that E.L. presented a likelihood of serious harm to herself and that C.M. was gravely disabled. When a trial court has weighed the evidence, appellate review is limited to determining whether substantial evidence supports the findings and, if so, whether the findings in turn support the trial court's conclusions of law and judgment. *LaBelle*, 107 Wn.2d at 209. Substantial evidence is "evidence in sufficient quantum to persuade a fair-minded person of the truth of the declared premise." *Holland v. Boeing Co.*, 90 Wn.2d 384, 390, 583 P.2d 621 (1978). The party challenging a finding of fact bears the burden of demonstrating the finding is not supported by substantial evidence. *Nordstrom Credit, Inc. v. Department of Revenue*, 120 Wn.2d 935, 939-40, 845 P.2d 1331 (1993).

■ Here, the parties disagree over the burden of proof the State is required to meet in obtaining an order for 14-day involuntary treatment. Appellants assert that the State is required to show by clear, cogent, and convincing evidence that probable cause for commitment exists, whereas the State contends the burden of proof is by a preponderance of the evidence. The State is correct. RCW 71.05.240. Appellants have cited the standard applicable to 90-day and 180-day involuntary commitment proceedings. RCW 71.05.310; *see LaBelle*, 107 Wn.2d at 209, 214.

■ We conclude the trial court's finding that E.L. presented a likelihood of serious harm to herself is supported by substantial evidence. Likelihood of serious harm means a "substantial risk" that physical harm will be inflicted by an individual upon his or her own person, another person, or the property of others. RCW 71.05.020(12). A substantial risk is evidenced by a recent overt act, which has caused harm or creates a reasonable apprehension of dangerousness. *In re Harris*, 98 Wn.2d 276, 284-85, 654 P.2d 109 (1982); *see* RCW 71.05.020(12)(a) (a substantial risk of harm to oneself is "evidenced by threats or attempts to commit suicide or inflict physical harm on oneself"). Here, E.L. had made repeated threats of suicide and had been observed making sawing motions against her wrist with a comb.[11] These recent overt acts constituted substantial evidence that E.L. presented a likelihood of serious harm to herself.

■ Likewise, we believe the trial court's finding that C.M. was gravely disabled is supported by substantial evidence. Gravely disabled means "a condition in which a person, as a result of a mental disorder: (a) Is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety, or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or

---

[11]At the probable cause hearing, the trial court did not admit testimony about E.L.'s attempt to slit her wrist with a knife. Thus, we have not included that incident in our analysis of the sufficiency of the evidence.

volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety." RCW 71.05.020(8). When, as here, the State proceeds under the definition of gravely disabled in subsection (b), it must present recent proof of significant loss of cognitive or volitional control. *LaBelle*, 107 Wn.2d at 208. The evidence must reveal a factual basis for concluding that the individual is not receiving or would not receive, if released, the care *essential* for his or her health or safety. *Id.*

Here, the trial court heard testimony from C.M.'s mother that, two days before the probable cause hearing, C.M. stood in the cold and rain for approximately two hours, then climbed onto the roof of her house and began yelling, jumping up and down, and hitting the skylights. C.M.'s mother further testified that C.M. had lost weight and was suffering from either delusions or hallucinations involving satellites. Mr. Work testified that, given his investigation, he did not believe C.M. had any place to stay where he would receive the care essential for his health and safety. This evidence supports the findings that C.M. had suffered a recent loss of cognitive or volitional control, would not have received the necessary care if released, and was therefore gravely disabled within the meaning of RCW 71.05.020(8)(b).

Affirmed.

KENNEDY, C.J., and COLEMAN, J., concur.

Review granted at 136 Wn.2d 1032 (1998).