FILED
COURT OF APPEALS
DIVISION II

2014 JUN -5 AM 8: 59

STATE OF WASHINGTON

BY_____

DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In re Detention of: | No. 43909-3-II |
| EJS, | |
| Respondent. | UNPUBLISHED OPINION |

BJORGEN, J — EJS has been involuntarily committed at Western State Hospital (WSH) since August 2009. After hearing testimony from petitioner Hamid Nazemi, PhD, a psychologist assigned to EJS's ward, and from EJS, the trial court found that EJS remains "gravely disabled" and entered an order imposing an additional 180 days of involuntary commitment. EJS appeals, claiming that the trial court violated his right to due process of law by entering the order based on testimony from a mental health professional who lacked sufficient first-hand knowledge of EJS's condition. Because the record shows that Nazemi was familiar with EJS's status based on a review of EJS's medical records, frequent contacts on the ward, and ongoing informal examinations, we affirm.

## FACTS

WSH has admitted EJS many times over the last 25 years due to a mental illness diagnosed as "schizoaffective disorder, bipolar type." Clerk's Papers (CP) at 22-24. The Seattle Municipal Court referred EJS to WSH for a psychiatric evaluation in 2009, after the court found him incompetent to stand trial on a charge of fourth degree assault, and WSH's medical professionals petitioned the superior court for EJS's involuntary commitment. The superior

court granted the petition, as well as several subsequent petitions from WSH medical professionals, prolonging the involuntary commitment.

Nazemi and Rolando Pasion, MD, filed the petition at issue here on August 15, 2012. They requested up to an additional 180 days' involuntary commitment, alleging that EJS "is gravely disabled[,] . . . requires intensive, supervised 24-hour restrictive care[,] and is not ready for less restrictive care." CP at 79-80. In their supporting declaration, Nazemi and Pasion described EJS's condition based on information from various sources, including personal interactions, EJS's medical chart, and a declaration submitted by another WSH medical professional in support of a previous involuntary commitment petition. Nazemi and Pasion's declaration stated that "[EJS] was approached for purposes of interview" but had "refused to participate and indicated that he wanted to exercise his right to remain silent." CP at 86.

The superior court held a hearing on the petition on August 20, 2012 at which Nazemi and EJS testified. EJS, represented by counsel, stipulated to Nazemi's qualifications as a psychologist. Nazemi testified that he had observed EJS since EJS had transferred to Nazemi's ward the preceding March and described EJS's response to Nazemi's attempt to conduct an in-depth examination. Nazemi admitted that, with some prompting, EJS has generally managed daily life activities sufficiently at WSH, and EJS's "overall presentation has been fairly consistent." Verbatim Report of Proceedings (VRP) at 12-13. Nazemi stated, however, that "medication adjustments are ongoing," that EJS would not discuss discharge planning with WSH staff because EJS believed himself independently wealthy, and that EJS denied having a mental illness and did not believe he needed to take medication. VRP at 9, 13. Nazemi described EJS's history of discontinuing medication following release from WSH and undergoing

2

"decompensation." VRP at 9-11. Finally, Nazemi gave the opinions that EJS could not obtain food, clothing, and shelter on his own and was not ready for placement in a less-restrictive setting.

EJS frequently interrupted the court and gave largely nonresponsive testimony when called to the stand, mostly concerning the spelling of his name and his repeated requests that the court, the attorneys, and Nazemi refer to him as "John Doe," the name under which police had initially booked him. VRP at 15-19. He asserted that his "original name" was "Joseph H. Stevens," and exhibited disorientation as to time, stating that he had been arrested on November 29, 2008 and had "been locked up for 72 days." VRP at 15, 17.

The court cut off EJS's testimony and granted the petition. The court summarized Nazemi's testimony and found by clear, cogent, and convincing evidence EJS had a mental disorder, and as a result, was

> in danger of serious physical harm resulting from a failure to provide for his . . . essential human needs of health or safety; manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his . . . actions[,] and is not receiving such care as is essential for his . . . health or safety.

CP at 96. The court concluded that EJS "continues to be gravely disabled" and that less restrictive alternatives were not in his best interest, and thus ordered "up to 180 days involuntary treatment at Western State Hospital." CP at 97-98. EJS timely appeals.

## ANALYSIS

Initially, EJS argues that his appeal is not moot, even though the order at issue has already expired. He cites *In re Detention of M.K.*, 168 Wn. App. 621, 626, 279 P.3d 897 (2012) as support. The State effectively concedes the issue, presenting no argument in response, and

3

properly so. *M.K.* is directly on point, holding that "each commitment order has a collateral consequence in subsequent petitions and hearings, allowing us to render relief if we hold that the detention under a civil commitment order was not warranted." 168 Wn. App. at 626. EJS's appeal is not moot.

Turning to the substance of the appeal, we acknowledge some difficulty in characterizing EJS's claim. If characterized as a challenge to the admission of Nazemi's testimony at the hearing, EJS has waived the issue under RAP 2.5(a), as the State correctly argues, by failing to raise a timely and specific objection to Nazemi's qualifications below. On the other hand, EJS contends that the superior court violated his right to due process of law by basing its conclusion that he remained gravely disabled on "a Petition and testimony which was given by a state's expert who did not have adequate first-hand knowledge to support the commitment." Br. of Appellant at 18. Understood as a challenge to the sufficiency of the evidence supporting his involuntary commitment, EJS's claim alleges both a "failure to establish facts upon which relief can be granted" and a "manifest error affecting a constitutional right," and thus RAP 2.5(a) by its terms does not bar review. *See In re Det. of LaBelle*, 107 Wn.2d 196, 201, 728 P.2d 138 (1986) (holding that "involuntary commitment for mental disorders is a significant deprivation of liberty which the State cannot accomplish without due process of law"); *City of Seattle v. Slack*, 113 Wn.2d 850, 859, 784 P.2d 494 (1989) (holding that "sufficiency of the evidence is a question of constitutional magnitude and can be raised initially on appeal"). We therefore address the claim on its merits.

No. 43909-3-II

## I. Standard of Review

Our Supreme Court has articulated the standard by which appellate courts review civil

commitment orders as follows:

> The burden of proof at 90-day or 180-day involuntary commitment proceedings is by clear, cogent and convincing evidence, RCW 71.05.310, which means the ultimate fact in issue must be shown by evidence to be "highly probable." Generally, where the trial court has weighed the evidence, appellate review is limited to determining whether substantial evidence supports the findings and, if so, whether the findings in turn support the trial court's conclusions of law and judgment. However, where the State must prove its case by clear, cogent and convincing evidence, the evidence must be more substantial than in the ordinary civil case in which proof need only be by a preponderance of the evidence; in other words, the findings must be supported by substantial evidence in light of the "highly probable" test. Accordingly, we will not disturb the trial court's findings of "grave disability" if supported by substantial evidence which the lower court could reasonably have found to be clear, cogent and convincing.

*LaBelle*, 107 Wn.2d at 209 (citations omitted). When reviewing a challenge to the sufficiency of

the evidence in a civil commitment proceeding, we view the evidence "in the light most

favorable to the State, and all reasonable inferences from the evidence must be drawn in favor of

the State and interpreted most strongly against the respondent." *In re Det. of Audett*, 158 Wn.2d

712, 727, 147 P.3d 982 (2006) (citations omitted).

## II. The Trial Court's Conclusion that EJS was Gravely Disabled

EJS argues that the superior court's commitment order violated his right to due process of

law because the court based its conclusion that EJS was "gravely disabled" on testimony from an

expert without sufficient first-hand knowledge to qualify as an "examining mental health

No. 43909-3-II

professional" under the civil commitment statute, RCW 71.05.290.[1] Br. of Appellant at 13-19.

The statute provides that a petition for additional involuntary treatment

> shall summarize the facts which support the need for further confinement and shall be supported by affidavits signed by . . . [o]ne examining physician and examining mental health professional. . . . The affidavits shall describe in detail the behavior of the detained person which supports the petition.

RCW 71.05.290.

> The statute defines "gravely disabled" as

> a condition in which a person, as a result of a mental disorder: (a) Is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

RCW 71.05.020(17). The trial court relied on both prongs of this definition.

> Under the first prong,

> the State must present recent, tangible evidence of failure or inability to provide for such essential human needs as food, clothing, shelter, and medical treatment which presents a high probability of serious physical harm within the near future unless adequate treatment is afforded. Furthermore, the failure or inability to provide for these essential needs must be shown to arise as a result of mental disorder and not because of other factors.

*LaBelle*, 107 Wn.2d at 204-05. The second prong requires

> recent proof of significant loss of cognitive or volitional control. In addition, the evidence must reveal a factual basis for concluding that the individual is not receiving or would not receive, if released, such care as is essential for his or her health or safety. It is not enough to show that care and treatment of an

---

[1] EJS assigns error generally to the trial court's conclusion that EJS was "gravely disabled." Br. of Appellant at 1. Although EJS briefly discusses the "gravely disabled" standard, he makes no attempt to show that the evidence presented fails to meet that standard except in one respect: the qualifications of the State's only witness, Nazemi. *See* Br. of Appellant at 9, 11-18.

individual's mental illness would be preferred or beneficial or even in his best interests. To justify commitment, such care must be shown to be essential to an individual's health or safety and the evidence should indicate the harmful consequences likely to follow if involuntary treatment is not ordered.

Furthermore, [the State must show] that the individual is unable, because of severe deterioration of mental functioning, to make a rational decision with respect to his need for treatment.

*LaBelle*, 107 Wn.2d at 208 (emphasis omitted). The State persuasively argues that it met the requirements of both prongs, which argument EJS makes no attempt to rebut. Thus, we consider only whether Nazemi qualified as an examining mental health professional under the civil commitment statute, RCW 71.05.290.

In *In re Detention of J.R.*, 80 Wn. App. 947, 956-57, 912 P.2d 1062 (1996), a consolidated appeal resolving the cases of three patients against whom trial courts had dismissed petitions for commitment, we considered the meaning of the term "examining" in RCW 71.05.290:

a doctor who previously has examined a patient, who maintains frequent contact with the patient, and who has extensive current knowledge about the patient's mental status may qualify as an examining doctor and share his information with the court by means of the petition. A patient who is being evaluated for a second 180-day commitment period generally has been in the hospital for at least the previous six and one-half months (one 14-day and one 180-day commitment period). RCW 71.05.230; RCW 71.05.320. Thus, the treating doctor has had a unique opportunity to evaluate the patient and may have a more thorough understanding of the patient th[a]n would a doctor who merely conducts a single, isolated, mental status examination. To find the latter qualified to petition the court, but not the former, could frustrate the goal of providing the court access to the most reliable evidence available.

Defining "examining" physician to include a treating doctor who is familiar with the patient by way of ongoing informal examinations is consistent with the language of the statute; examining suggests an ongoing, continuing, comparative process.

The *J.R.* court then contrasted the qualifications of the professionals petitioning for commitment of two of the patients with those of the doctor who testified at the third patient's hearing:

7

In the cases of J.R. and W.B., both the treating psychologists and psychiatrists testified that they had daily contact with each patient, prepared periodic formal evaluations, and evaluated them continually and constantly. Thus, those doctors satisfied the definition of "examining" professional, as used in RCW 71.05.290. . . . Dr. Jackson[, in contrast,] evaluated G.R. only cursorily; he had less than two weeks of contact and the contacts were for very brief periods of time. Dr. Jackson had not conducted any type of examination or evaluation in the past that could serve as a baseline for a continuing evaluation process. In light of these minimal contacts, the court commissioner did not err in concluding that Dr. Jackson did not qualify as an "examining" physician.

80 Wn. App. at 957. Based on this analysis, the *J.R.* court held that the trial court had erred in dismissing the petitions for commitment of J.R. and W.B., but affirmed the dismissal of the petition against G.R. 80 Wn. App. at 958.

Nazemi's first-hand knowledge of EJS's mental condition lies somewhere between the two extremes discussed in *J.R.* EJS points out that, although the portion of the commitment order describing the basis for the court's conclusion states that "[t]he Respondent's current Mental Status Examination reveal[s]" Nazemi admitted that he performed no such examination on EJS. CP at 95. However, the reason Nazemi did not perform a mental status examination is that EJS refused to participate. A rule that prevented a mental health professional from successfully petitioning for involuntary commitment where the patient had refused to cooperate in a mental status evaluation would create a perverse incentive indeed. Moreover, the *J.R.* court expressly rejected the argument that a person "must conduct a formal mental status examination of the patient" in order to qualify as an "examining" professional. *J.R.*, 80 Wn. App. at 955-57.

The record shows that Nazemi attempted to perform such an evaluation, had examined EJS's medical records in detail, and had the opportunity to directly observe EJS over the course of several months of regular contacts on the ward. Even though Nazemi had not himself performed them, he had reviewed numerous prior mental status evaluations performed by

8

colleagues, giving him an adequate "baseline for a continuing evaluation process." *J.R.*, 80 Wn. App. at 957. This record supports a finding that Nazemi was "familiar with [EJS] by way of ongoing informal examinations," and places the basis of Nazemi's knowledge regarding EJS's condition much closer to that held sufficient by the *J.R.* court. *J.R.*, 80 Wn. App. at 957.

EJS also argues that the basis for Nazemi's knowledge was not "firsthand" because Nazemi relied on "hearsay declarations by others, many of whom were not identified or only identified by initials." Br. of Appellant at 15-17. We disagree.

Initially, the supposed "hearsay declarations" Nazemi relied upon consisted of entries in EJS's medical charts, and thus plainly fall under the statutory business records exception to the rule against hearsay. RCW 5.45.020; *State v. Ziegler*, 114 Wn.2d 533, 538, 789 P.2d 79 (1990). As the *Ziegler* court noted,

> "As applied to hospital records, compliance with the [business records as evidence act, RCW 5.45.020] obviates the necessity, expense, inconvenience, and sometimes impossibility of calling as witnesses the attendants, nurses, physicians, X ray technicians, laboratory and other hospital employees who collaborated to make the hospital record of the patient. It is not necessary to examine the person who actually created the record so long as it is produced by one who has the custody of the record as a regular part of his work or has supervision of its creation."

114 Wn.2d at 538 (quoting *Cantrill v. Am. Mail Line, Ltd.*, 42 Wn.2d 590, 608, 257 P.2d 179 (1953)) (citations omitted). Nazemi plainly had custody of EJS's medical records as a regular part of his work, which included supervision of many of the hospital staff who made the disputed entries.

In addition, as the State points out, the commitment statute unambiguously contemplates that such medical records should play an important role in commitment decisions. Indeed, the statement of legislative intent expressly provides that

No. 43909-3-II

[f]or persons with a prior history or pattern of repeated hospitalizations or law enforcement interventions due to decompensation, the consideration of prior mental history is particularly relevant in determining whether the person would receive, if released, such care as is essential for his or her health or safety.

RCW 71.05.012. Nazemi properly relied on hospital records in preparing the affidavit and testifying at the hearing.

The record establishes that Nazemi qualified as an examining mental health professional under RCW 71.05.290(2)(b). Thus, sufficient evidence supports the trial court's conclusions in the order of commitment. We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

BJORGEN, J., A.C.J.

We concur:

WORSWICK, J.

JOHANSON, C.J.

10