# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Detention of<br><br>D.A.,<br><br>                      Appellant. | No. 79458-2-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

APPELWICK, J. — D.A. was committed involuntarily for 14 days. He argues that the State failed to prove by a preponderance of the evidence that he presented a likelihood of serious harm to others as a result of a mental disorder. He further contends that he was not afforded a meaningful opportunity to be heard at his probable cause hearing. We affirm.

## FACTS

On November 14, 2018, D.A.'s sons Vincent,[1] David, and Anthony flew home to Renton to check on their father due to his erratic conduct. D.A. had cut off communication with his family, had kicked his wife out of the house, and was exhibiting "rages" in his behavior. He had also started spending large amounts of money. For example, he had recently purchased 2 cars and a motorcycle within

---

[1] To maintain D.A.'s privacy, we use only his sons' first names in this opinion.

Citations and pin cites are based on the Westlaw online version of the cited material.

a span of 2 months. And, despite having shot a firearm only once before in his life, he had purchased 18 or 19 firearms and thousands of rounds of ammunition.

D.A. suffered a traumatic brain injury (TBI) in 2012 and had stopped going to the doctor for treatment. During their visit, Vincent, David, and Anthony tried to convince D.A. to go to the doctor to have his medications checked, but he refused.

After refusing to go to the doctor, D.A. insisted on taking his guns to the shooting range. He asked his sons to put his guns in the car for him. They refused, at which point D.A. grabbed his rifle. He then started to go outside to put his gun in the car. His sons took the rifle from him. D.A. proceeded to walk towards the front door, but Vincent blocked him from leaving. D.A. reacted by shoving his forearm into Vincent's throat and pinning him against the door for 30 seconds, cutting off his airway. Vincent felt like he was going to pass out and finally pulled D.A.'s arm off of his throat.

After the altercation with Vincent, D.A. walked towards the garage. Anthony stood in front of the garage door and blocked him from leaving. D.A. then pushed Anthony into the door multiple times and punched him in the face. Anthony continued to stand there and would not let D.A. go out the garage door. Vincent and Anthony both testified that they had never seen D.A. engage in this type of behavior and feared that he might harm them.

At one point during their visit, D.A. told his sons that he had discovered a money laundering ring and that people were "after him" as a result. He also stated that a night or two before, someone had shot one of his car tires out.

2

Anthony eventually spoke with D.A.'s psychiatrist, who advised him to call 911 and have D.A. assessed by mental health professionals for involuntary commitment. Anthony then called the police. D.A. told his sons that they were trespassing and also called the police. After the police and an ambulance arrived, D.A.'s sons tried to help him sit on a gurney. D.A. reacted by punching Anthony in the ribcage and threatening to hit him in the testicles.

D.A. was taken to the emergency room at Swedish Medical Center. Before his arrival, D.A.'s neuropsychiatrist called the emergency department and told a physician that D.A. had demonstrated mania since June 2018, had been experiencing increased paranoia, and had purchased 19 guns in the past week. Upon his arrival, D.A. was aggressive and verbally threatening towards staff. He was therefore placed in four-point restraints. Benjamin Kallay, a designated crisis responder, met with D.A. and advised him of his legal rights. D.A. refused voluntary psychiatric hospitalization. His physician opined that he should be detained. Kallay found that D.A. presented "an imminent risk of serious harm to others" and manifested "a severe deterioration in his routine functioning." Thus, he concluded that D.A. required "involuntary psychiatric commitment for safety and stabilization" and petitioned for his initial detention.

On November 15, 2018, D.A. was taken into emergency custody by law enforcement at Swedish. The next day, the State petitioned for 14 days of involuntary treatment. A probable cause hearing on the petition was held on November 19, 2018. At the hearing, Vincent and Anthony testified about the events leading up to D.A.'s commitment. D.A.'s wife testified about recent changes

in his behavior.  Erica Williams, the court evaluator for Swedish, opined that D.A. presented a risk of harm to others as a result of a mental disorder.  She explained in part,

> due to [D.A.]'s mental disorder, I am concerned about his difficulty with impulse control, his moving ability, um, his agitation and his verbal threat [of] violence here in the hospital, in the emergency room, as well as his, um, verbal threat of violence to his family and his documented . . . assaultive behavior to his family.

D.A. also testified.  At one point, he stated that he could not think of anything about his behavior that would have caused his sons' concern.

The trial court found by a preponderance of the evidence that D.A. presented a likelihood of serious harm to others as a result of a mental disorder. Accordingly, it granted the State's petition to detain D.A. for 14 days of involuntary treatment.

D.A. appeals.

## DISCUSSION

D.A. makes two main arguments.  First, he argues that the State failed to prove by a preponderance of the evidence that he presented a likelihood of serious harm to others as a result of a mental disorder.  Second, he argues that he was not afforded a meaningful opportunity to be heard at his probable cause hearing.[2]

---

[2] As an initial matter, D.A. argues that, despite the expiration of his involuntary commitment order, his appeal is not moot.  The State does not dispute D.A.'s argument and asks that we decide this case on the merits.  "An individual's release from detention does not render an appeal moot where collateral consequences flow from the determination authorizing such detention."  In re Det. of M.K., 168 Wn. App. 621, 626, 279 P.3d 897 (2012).  Commitment orders have collateral consequences because a trial court presiding over a future involuntary commitment hearing may consider an individual's prior involuntary commitment

4

I.    Sufficiency of Evidence

D.A. argues that substantial evidence does not support five of the trial court's findings of fact.  He contends that the remaining findings fail to establish that he presented a likelihood of serious harm to others.

To commit a person for 14 days of involuntary treatment, the State must show by a preponderance of the evidence that a person presents a likelihood of serious harm, or is gravely disabled, as a result of a mental disorder.  RCW 71.05.240(3)(a).  A "likelihood of serious harm" to others means a "substantial risk that . . . physical harm will be inflicted by a person upon another, as evidenced by behavior which has caused such harm or which places another person or persons in reasonable fear of sustaining such harm."  Former RCW 71.05.020(33)(a)(ii) (2018).

Where, as here, the trial court has weighed the evidence, our review is "limited to determining whether substantial evidence supports the findings and, if so, whether the findings in turn support the trial court's conclusions of law and judgment."  In re Det. of W.C.C., 193 Wn. App. 783, 793, 372 P.3d 179 (2016).  Substantial evidence is "evidence in sufficient quantum to persuade a fair-minded person of the truth of the declared premise."  Holland v. Boeing Co., 90 Wn.2d 384, 390-91, 583 P.2d 621 (1978).  The party challenging a finding of fact bears the burden of demonstrating that the finding is not supported by substantial evidence.  In re Det. of A.S., 91 Wn. App. 146, 162, 955 P.2d 836 (1998), aff'd, 138 Wn.2d

orders.  Id. at 628-29.  As a result, D.A.'s appeal of his commitment order is not moot.

5

898, 982 P.2d 1156 (1999). We do not review credibility determinations. In re Det. of H.N., 188 Wn. App. 744, 763, 355 P.3d 294 (2015). Unchallenged findings of fact are verities on appeal. W.C.C., 193 Wn. App. at 793 n.5.

A. Substantial Evidence

The trial court entered supplemental findings of fact and conclusions of law on January 4, 2019. Of these findings, D.A. challenges discrete portions of findings of fact 6, 7, 10, 15, and 16.

First, D.A. argues that substantial evidence does not support the portion of finding of fact 6 that states D.A. punched Anthony "in the testicles." He also argues that substantial evidence does not support the portion of finding of fact 16 that provides, "[D.A.] admitted he has a history of paranoia." The State concedes that both findings are not supported by the record. We accept the State's concession and conclude that substantial evidence does not support the challenged portions of these findings.

D.A. argues next that substantial evidence does not support finding of fact 7. That finding provides, "Anthony is very much in fear that his father could harm him because of his mental [s]tate." D.A. contends that Anthony was testifying by telephone from Atlanta, and that any potential fear of harm to him "cannot be sustained on this record where D.A. was more than 2,600 miles away." After testifying that D.A. had punched him in the face and ribcage, Anthony stated that he feared his father could harm him. He also cited his fear of D.A. "being able to drive around" with his anger, and his concern regarding the firearms in D.A.'s house. Even if Anthony was not in Washington at the time of the hearing, his

testimony constitutes substantial evidence that he feared D.A. could harm him due to his mental state.

D.A. further asserts that substantial evidence does not support the portion of finding of fact 10 that states D.A. "is not even allowed to drive because of seizures from a [TBI]." D.A. argues that the record establishes that his last seizure was on February 11, 2018, and that he was eligible for relicensing on August 11, 2018. D.A.'s wife testified that his last seizure was on February 11, 2018, he was cleared to get his license on August 11, 2018, and one of his doctors signed the necessary form. The State counters that D.A. was not yet licensed at the time of the hearing. Even so, the record does not support that D.A. was not allowed to drive at that time <u>because of seizures</u>. Thus, the challenged portion of finding of fact 10 is not supported by substantial evidence.

Last, D.A. contends that substantial evidence does not support the portion of finding of fact 15 that states he had purchased 18 to 19 firearms. He argues that the "evidence was undisputed" that he had purchased only 18 firearms, and had possession of only 16. Vincent testified that D.A. had purchased 18 firearms. Anthony testified that he saw approximately 19 firearms in D.A.'s house. This testimony constitutes substantial evidence that D.A. had purchased 18 to 19 firearms.

Substantial evidence supports the challenged portions of findings of fact 7 and 15. But, it does not support the challenged portions of findings of fact 6, 10, and 16. As a result, we do not consider those portions in our review of the evidence below.

B. Remaining Findings

As to the remaining findings, D.A. asserts that they fail to establish that he presented any significant threat of harm to others. He points out that the witnesses agreed he had never before been violent "in the many years they had been together," and that he had no criminal history. He explains that "[t]his long history stands in contrast to the truly aberrational nature of the conduct described as occurring . . . during the sons' intervention and his subsequent detention."

The remaining findings of fact demonstrate that D.A. suffers from mood disorder with mania. He is "verbally aggressive" and "assaultive toward family," and has "poor impulse control and impaired judgment." D.A.'s sons flew home to check on him due to his erratic behavior. He had cut off communication with his family and kicked their mother out of the house. He had also exhibited mania and paranoia through his actions involving excessive purchases. For example, he had purchased 18 or 19 firearms with "significant ammunition."

When his sons confronted him about going to the doctor, D.A. insisted on going to the firing range. When they took a firearm from him, D.A. reacted by pinning Vincent against his front door and shoving his right forearm into Vincent's throat for about 30 seconds, cutting off Vincent's airway. Vincent felt like he was going to pass out. Anthony then tried to block D.A. from leaving in his car, at which point he punched Anthony in the face. During the incident, D.A. talked about a money laundering scheme and people being after him. As D.A. was later taken away by police, he punched Anthony again. Both Vincent and Anthony feared that D.A. could harm them in the condition he was in.

8

Even if D.A. had not been violent towards his sons in the past, this evidence supports a finding that he currently presented a likelihood of serious harm to others as a result of a mental disorder. Accordingly, the trial court did not err in ordering 14 days of involuntary treatment.

II. Meaningful Opportunity to Be Heard

D.A. argues next that, on two occasions, he sought to address the court after hearing its ruling. He states that the court simply advised him that the hearing was over and failed to provide him "with an opportunity to address the concerns identified by the judge's ruling." He contends that the trial court's refusal to allow him to address the court was a violation of his right to due process, specifically his right to a meaningful opportunity to be heard.

"Procedural due process requires that when the State seeks to deprive a person of a protected interest, the State provides the individual adequate notice of the deprivation and a meaningful opportunity to be heard." State v. Beaver, 184 Wn.2d 321, 336, 358 P.3d 385 (2015). Due process is a flexible concept that calls for different procedural protections depending on the interests at stake. Id. To ensure that due process requirements are met in cases involving the potential deprivation of a private interest by the government, we apply the balancing test in Mathews v Eldridge, 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). City of Bellevue v. Lee, 166 Wn.2d 581, 585, 210 P.3d 1011 (2009). The three factors of the Mathews test are "(1) the potentially affected interest; (2) the risk of an erroneous deprivation of that interest through the challenged procedures, and

9

probable value of additional procedural safeguards; and (3) the government's interest, including the potential burden of additional procedures." Id.

After the trial court announced its ruling, D.A. stated that he wanted to address the court. D.A.'s counsel told the court that she had advised him not to address the court at that time. In response, the trial court told D.A. that the hearing was over. D.A. then stated that he had "a right to address the court" and continued to insist on addressing it. His counsel again advised him not to address the court. The trial court denied D.A.'s request and told him for a second time that the hearing was over.

The State contends that D.A. had more than an adequate opportunity to challenge its case against him and present evidence in his defense. Relying on RCW 71.05.360(8), it points out that D.A. "was afforded competent counsel who cross-examined all the petitioner's witnesses, presented his own testimony and re-examination, and closing argument." RCW 71.05.360(8) governs the rights of an involuntarily detained person at a probable cause hearing. It provides,

> At the probable cause hearing the detained person shall have the following rights in addition to the rights previously specified:
>
> (a) To present evidence on his or her behalf;
>
> (b) To cross-examine witnesses who testify against him or her;
>
> (c) To be proceeded against by the rules of evidence;
>
> (d) To remain silent;
>
> (e) To view and copy all petitions and reports in the court file.

RCW 71.05.360(8).

10

D.A. does not argue that RCW 71.05.360(8) fails to comport with procedural due process requirements. Nor does he argue that the trial court violated the statute in denying his request to address the court. Rather, he asserts that where he "specifically sought to further illuminate the trial court regarding his condition, the lack of any meaningful threat of harm to others and his ability, with assistance, to ensure for [sic] his own well-being, then procedural due process dictates that he be provided that opportunity." D.A. does not address the fact that he testified about these topics at the hearing. During his testimony, his counsel asked him about his TBI, the altercation with his sons, and his ability to care for himself. D.A. cites no authority that would afford him an additional right to be heard after his counsel cross-examined the State's witnesses, he testified in his defense, his counsel offered closing argument, and the court announced its ruling.

Under these circumstances, D.A. was afforded a meaningful opportunity to be heard. Accordingly, the trial court did not violate his right to procedural due process.

We affirm.

_Appelwick, J._

WE CONCUR:

_Chun, J._          _Andrus, A.C.J._

11