# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the matter of the Detention of: | DIVISION ONE |
| R.M., | No. 79839-1-I |
| Appellant. | UNPUBLISHED OPINION |

DWYER, J. — R.M. appeals from a superior court order committing her to 14 days of involuntary mental health treatment. She contends that the commitment order must be reversed because it is premised on the superior court's finding that she is gravely disabled and the finding is not supported by substantial evidence in the record. Because substantial evidence in fact supports the superior court's finding that R.M. was gravely disabled, we affirm.

I

In 2011, R.M. began living at Kerner-Scott House, a permanent supportive housing facility for formerly homeless adults with severe mental illness. On February 14, 2019, R.M.'s landlord's representative, Tracy Joy Struck, inspected R.M.'s apartment as part of a full building health and safety inspection. Inside, Struck found what she estimated to be between 100 and 150 large plastic garbage bags, each of which was filled and stacked high in the approximately

Citations and pin cites are based on the Westlaw online version of the cited material.

375 square foot apartment. The stacked bags left only the bathroom and a narrow aisle in the kitchen accessible. There was no room for a gurney to fit between the bags in the event of an emergency. The bags filled the bathtub, refrigerator, and freezer and covered the heater, windows, intercom, and electrical outlets. R.M. was sleeping on the floor of her kitchen. R.M. was incontinent, and Struck saw and smelled R.M.'s dried urine and feces caked on the apartment's floor.

On March 4, 2019, Struck returned to R.M.'s apartment with a maintenance person to replace a light bulb. R.M. did not allow Struck to enter. Struck expressed concern for R.M.'s safety and warned that if R.M. did not begin to manage her belongings, Kerner-Scott staff would "dig out" her apartment and dispose of her things. Later that day, R.M. and Struck agreed that R.M. would produce two bags for Struck to dispose of every day to avoid a "dig out." However, R.M. never removed any bags from her unit.

On March 11, 2019, Struck and Kerner-Scott maintenance personnel entered R.M.'s apartment to fix a damaged pipe, which was causing a major leak on the floors below. They found R.M. standing in stagnant water in her kitchen, barefoot and naked from the waist down. The apartment still smelled strongly of urine and feces. Struck observed that both were still visible through the standing water. She also observed that the number of bags in the apartment remained unchanged.

The maintenance personnel refused to enter while R.M. was naked. Struck asked R.M. to put on pants or wait in the bathroom—still the only other

2

accessible space. R.M. could not put on pants because they were still wet from washing, and she refused to wait in the bathroom because she insisted on keeping watch over her bags. She covered herself with a soaked blanket and observed the work amidst the bags. When one of the maintenance personnel began to leave the apartment, R.M. asked Struck to inspect the bottoms of his boots because she was worried slips of paper on which she had written notes were sticking to the boots and would be lost when he left.

On March 14, 2019, the superior court granted a King County designated crisis responder's petition to commit R.M. for 72 hours of involuntary mental health evaluation and treatment. At the hospital, testing showed that R.M. had a urinary tract infection. Testing also revealed that R.M. was suffering from low potassium levels and had traces of ketone in her urine—both indicators of malnutrition. The hospital also treated R.M. for lice, although it was not proved whether she contracted the lice before or after she entered the hospital.

A licensed independent clinical social worker, Hyemin Song, evaluated R.M. and found that she had a mental disorder with a working diagnosis of obsessive-compulsive disorder and a hoarding disorder. Song observed that R.M experienced "a great deal of anxiety . . . and obsessive behaviors over her belongings" and that these symptoms "create[d] [a] phobia around . . . the things that she need[ed] to do to take care of herself." R.M. told another psychological evaluator that, if given the choice between having others remove her belongings and eviction, she would prefer to be evicted. R.M. stated: "I know that the homelessness will be my only choice, but I will choose that over living in [Kerner-

Scott House]." Treating physicians prescribed antidepressants to R.M. so as to help her manage her anxiety, but she resisted taking this medication in the hospital and expressed her intention to not take it after leaving.

While R.M. was in the hospital, Struck returned to R.M.'s apartment to clean it. She once again observed that there was "crusted . . . feces in the bathroom, and throughout the unit." She and her staff opened several of the bags and found they were filled with "rotten food, old containers . . . [and] lots of wet materials." Struck was concerned about the food attracting pests as well as the fire and "topple" hazards that the bags themselves presented. The Kerner-Scott staff then discarded all of the bags and cleaned the apartment.

On March 19, 2019, the State petitioned the court to commit R.M for an additional 14 days of mental health treatment. After a hearing the next day, the superior court granted the State's petition.

II

R.M. contends that the superior court erred by committing her to 14 days of involuntary mental health treatment. This is so, R.M. avers, because the superior court's order is premised on a finding that she was gravely disabled and this finding is not supported by substantial evidence in the record. We disagree.

"When a trial court has weighed the evidence, appellate review is limited to determining whether substantial evidence supports the findings and, if so, whether the findings in turn support the trial court's conclusions of law and judgment." In re Det. of A.S., 91 Wn. App. 146, 162, 955 P.2d 836 (1998) (citing In re Det. of LaBelle, 107 Wn.2d 196, 209, 728 P.2d 138 (1986)), aff'd, 138

Wn.2d 898, 982 P.2d 1156 (1999). We "will not disturb the trial court's findings of 'grave disability' if supported by substantial evidence." LaBelle, 107 Wn.2d at 209. "Substantial evidence is evidence in sufficient quantum to persuade a fair-minded person of the truth of the declared premise." Holland v. Boeing Co., 90 Wn.2d 384, 390-91, 583 P.2d 621 (1978). "The substantial evidence standard is deferential and requires the appellate court to view all evidence and inferences in the light most favorable to the prevailing party." Lewis v. Dep't of Licensing, 157 Wn.2d 446, 468, 139 P.3d 1078 (2006). We treat unchallenged findings as verities on appeal. State v. Stenson, 132 Wn.2d 668, 697, 940 P.2d 1239 (1997).

To commit a person for up to 14 days of involuntary mental health treatment, the State must prove, by a preponderance of the evidence, that the person is gravely disabled. RCW 71.05.240(3)(a). A person who "[i]s in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety" as a result of a mental disorder is gravely disabled. RCW 71.05.020(22)(a). In order to establish that the person is in danger, "the State must present recent, tangible evidence of failure or inability to provide for such essential human needs as food, clothing, shelter, and medical treatment which presents a high probability of serious physical harm within the near future unless adequate treatment is afforded." LaBelle, 107 Wn.2d at 204-05. However, there is no requirement that the State show that the danger is imminent. LaBelle, 107 Wn.2d at 203.

In the present matter, the superior court heard testimony from Struck that R.M. had packed her tiny apartment with over 100 large plastic trash bags. By themselves, these bags endangered R.M. by threatening to topple onto her. The bags also filled the bathtub—limiting R.M.'s ability to clean herself—and the freezer and refrigerator—preventing R.M. from safely storing food. Furthermore, the bags blocked the heater—creating a fire hazard—and the intercom—preventing R.M. from calling for help in an emergency, as well as the windows and electrical outlets. There was also no room for a gurney in the apartment if R.M. required medical care. At least some of these bags were filled with rotting food or soiled food containers, which threatened to attract pests and possibly sicken R.M.

Furthermore, R.M. displayed considerable paranoia and anxiety about the bags, refusing to leave Struck and maintenance personnel unattended with the bags when they were fixing a leaky water pipe in her unit. The number of bags, the fact that they blocked large portions of the apartment and necessary amenities, and the rotting food waste—which at least some bags contained—all posed a serious danger of physically harming R.M. Her failure to produce even a single bag for disposal shows that she was not able to address and fix hazards in her living environment to protect her health and safety.

Struck also testified that the floor in R.M.'s apartment was caked with excrement, and there is no evidence that R.M. ever attempted to remove it. Furthermore, the evidence established that R.M. slept on her feces covered floor. Thus, it is apparent that R.M.'s inability to keep her living space clear of human

waste put her at serious risk of disease and further shows that she was unable to provide for her own health and safety.

Additionally, while at the hospital, R.M. was diagnosed with a urinary tract infection. This was likely caused by her lack of hygiene and demonstrates that R.M. did have issues preventing disease. Similarly, urine testing revealed low potassium and the presence of ketones in her urine. These are both indicators of malnutrition and show that R.M. was having difficulty keeping herself properly fed. The hospital lab results reinforce the fact that R.M. was simply unable to properly care for her own health and safety.[1]

Taken together, the evidence in the record is plainly sufficient to persuade a reasonable finder of fact that R.M. was in serious danger of physical harm as a result of her mental disorder.

Nevertheless, R.M. contends that, because Kerner-Scott staff disposed of the bags and cleaned her apartment while she was in the hospital, she was no longer in imminent danger "from her inability to care for herself." In response, the State asserts that imminent danger is not required and that, if allowed to leave the hospital without further treatment, R.M. "would continue in the manner of behaviors that brought her into the hospital and her symptoms would worsen," thus endangering her. The State has the better argument.

---

[1] R.M. contends that the State failed to prove that she was actually harmed as a result of her mental disorder and that she was therefore not gravely disabled. However, she fails to cite to any authority that requires proof of actual harm—in fact, there is no such requirement. Additionally, we note that even if actual harm was required, the State presented medical evidence that R.M. suffered from malnutrition and a urinary tract infection as a result of her mental disorder and resulting inability to adequately care for herself.

LaBelle explicitly rejects any requirement that the State prove that danger is imminent when arguing that a person is gravely disabled. 107 Wn.2d at 203. Therein, the court explained that

> [b]y the time the State files a petition for 14, 90 or 180 days of involuntary commitment under the gravely disabled standard, the individual will already have been detained in a hospital or treatment center for a period of time. The care and treatment received by the detained person in many cases will have lessened or eliminated the "imminence" of the danger of serious harm caused by that person's failure to provide for his essential health and safety needs. A requirement of "imminent" danger as a prerequisite to continued confinement could result in the premature release of mentally ill patients who are still unable to provide for their essential health and safety needs outside the confines of a hospital setting but who, because of their treatment there, are no longer in "imminent" danger of serious physical harm. The State's continuing interest in confining and treating such individuals would be frustrated by a requirement of "imminent" danger for all commitments.

LaBelle, 107 Wn.2d at 203.

The same reasoning applies herein. While R.M. was temporarily committed, Kerner-Scott staff removed the bags and cleaned her apartment. However, removing one of the symptoms of R.M.'s illness did not remove the source of the danger—her mental disorder and the behaviors resulting therefrom. At the time of the hearing, R.M. refused to accept that she needed treatment and was not compliant with her medication. Song testified that, if released, R.M.'s compulsive behaviors would continue and that she would continue to neglect her own self-care. The evidence established that R.M. remained in danger of serious physical harm even after Kerner-Scott staff cleaned her apartment.

Substantial evidence supports the superior court's finding that R.M. was gravely disabled. This finding supports the superior court's commitment order. Therefore, R.M. has not established an entitlement to appellate relief.

Affirmed.

_____
Dwyer, J.

WE CONCUR:

_____        _____
Mann, C.J.                                              Verellen, J.