## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| In the Matter of the Detention of: | No.  55888-2-II |
| T.W. | |
| Appellant. | UNPUBLISHED OPINION |

PRICE, J. — T.W. appeals the superior court's ruling in a 180-day involuntary commitment proceeding.  T.W. argues that there was insufficient evidence (1) to support the finding that he was gravely disabled and (2) to impose a felony-based civil commitment.  We affirm the superior court.

### FACTS

#### I. UNDERLYING INCIDENT

On April 10, 2020, T.W., in a highly agitated state, threatened to kill his grandfather, George Rains, and others in his household during a telephone call.  In response to T.W.'s threat, Rains ensured that the doors were locked, armed himself, and called the police to inform them of the threat and the possible location of T.W.

An officer was sent to locate T.W.  The officer found T.W. near a medical center, where a veterans' clinic had been previously located.  T.W. told the officer he was trying to get help.  However, as the officer approached, T.W. became agitated and told the officer that "satellites were controlling [the officer's] voice," and he did not want to talk anymore.  Verbatim Report of Proceedings (VRP) (Mar. 4, 2021) at 32.  When the officer got closer, T.W. "became very, very aggressive" and told the officer "it was [T.W.'s] right to fight [the officer]."  *Id.*  But when T.W.

was within 10 feet of the officer, he attempted to flee. Additional officers arrived, and T.W. was arrested.

II. LEGAL PROCEEDINGS

The State charged T.W. with felony harassment. But the court dismissed T.W.'s felony harassment charge without prejudice because T.W. was incompetent and unable to assist in his defense due to a mental disease. Two weeks later, doctors at Western State Hospital (WSH), Christine Collins and William Ehlers, petitioned for T.W. to be detained for 180 days for involuntary treatment.

A. TESTIMONY

1. Arresting Officer and George Rains

At the hearing on WSH's petition, both the arresting officer and Rains testified consistent with the facts above. Additionally, the State asked Rains, "At the time that [T.W.] called you and made the death threat, were you in fear for your life?" VRP (Mar. 4, 2021) at 14. Rains replied, "I was." *Id.* However, after he had armed himself, Rains denied that he was afraid of T.W. being able to kill him.

2. Dr. Collins

Dr. Collins, a licensed psychologist, testified that she believed T.W. was gravely disabled as a result of a behavioral disorder. T.W. met the "criteria for unspecified schizophrenia spectrum and other psychotic disorder." VRP (Mar. 4, 2021) at 38. T.W. suffered from recurring delusions about satellites, including satellites controlling his feelings. Dr. Collins noted that T.W. has "exhibited mood liability," "disorganized speech," and "circumstantial and tangential thought

processes." *Id.* at 39. Furthermore, while there was some recent improvement, T.W also exhibited behavioral dysregulation—cursing and yelling at staff and peers.

According to Dr. Collins, T.W. had "some impaired insight" into his mental illness. *Id.* at 42. T.W. had admitted that he has heard and seen things that others do not and had "reported that the beliefs [about satellites] began around the time that he was in the military." *Id.* at 40. But T.W. had denied "all symptoms of mental illness other than PTSD-related symptoms" on multiple occasions. *Id.* at 42. Dr. Collins also believed that T.W.'s medication had not relieved T.W. of his delusions. T.W. told her that he had not seen or heard things that others do not "in a couple of months," but there was a note from as recently as a week before the hearing that T.W. had stated that he believed he was on a satellite. *Id.* at 40.

And even though T.W. was cooperative, he also displayed "some elusiveness when answering questions." *Id.* at 40-41. When asked to elaborate on his hallucinations, specifically what he saw and heard that others did not, T.W. replied, "nothing important." *Id.* at 41 (internal quotation marks omitted). Being guarded, according to Dr. Collins, is associated with paranoia, a symptom of schizophrenia.

Dr. Collins thought that T.W. could make some rational decisions, but she was unable to assess whether he was fully rational in all his decisions because he did not fully participate and declined to interact in group discussions. Dr. Collins testified to notes indicating that T.W. was guarded and did not want to fully answer questions. When asked about his beliefs about satellites "for a while or a little bit of time or the question continues," T.W. became frustrated and at one point he abruptly left a session. *Id.* at 45.

3

At the time of the hearing, T.W. was able to accomplish "activities of daily living." *Id.* at 43. However, Dr. Collins was concerned about T.W. being released because he was not currently connected with the Veteran's Administration (VA) and if T.W. experienced a lack of medication and treatment, then he "could potentially become behaviorally dysregulated and could psychologically decompensate." *Id.* at 48.

Dr. Collins was also concerned that WSH had not yet verified whether T.W. could live with his mother, as he planned.[1] She was concerned about whether T.W. would be able to continue taking his medication and support himself if he could not stay with his mother because T.W. had no other plans.

Dr. Collins also testified that T.W. had "deficiencies that would place him at risk of serious physical harm if he were released today" because he did not have a verifiable plan. *Id.* at 43. She was worried whether he would be able to continue taking his medication, have a place to live, or care for himself. Dr. Collins was also concerned that T.W. would not continue taking his medications because during interviews, T.W. indicated that the medications were not necessary and they just made him tired, notwithstanding the fact that he recently reported he would keep taking them. T.W. did tell Dr. Collins that he was open to getting treatment at the VA.

Dr. Collins also believed that T.W. would commit acts similar to felony harassment if released. Dr. Collins noted that although T.W. had denied any suicidal or homicidal ideations and

---

[1] After reviewing the record further, Dr. Collins acknowledged that four months prior to the hearing T.W. had signed a release of information and that WSH had contacted T.W.'s mother who confirmed that T.W. could live with her. Still, Dr. Collins explained when she reviewed the notes from the prior month, there was no current release on file, so she did not know whether the past release had expired or been revoked.

that he had not "behaviorally dysregulated to the point of needing seclusion or restraint," he could become frustrated and irritable "as evidenced by yelling, and ending meetings or conversations, and walk[ing] away," especially when asked about his symptoms related to delusions about satellites. *Id.* at 46, 58. Additionally, Dr. Collins relied on incidents documented by the arresting officer that T.W. had "allegedly made threats of violence related to the police about satellites," and there was another documented incident when T.W. "was upset and allegedly harmed himself and threatened to harm his mother." *Id.* at 46.

Finally, recognizing T.W.'s ability to generally function, Dr. Collins supported T.W's release to a lesser restricted alternative involving monitored care. However, because no such alternatives had been created or proposed, Dr. Collins recommended further inpatient treatment consistent with the State's petition.

3. T.W.'s Mother and T.W.

T.W.'s mother testified, explaining that T.W. could live with her if he was released. T.W.'s mother recognized that T.W. needed to continue taking his medication and that she was "[a]bsolutely" willing to help him. VRP (Mar. 8, 2021) at 77-78. T.W.'s mother had contacted the VA several times, but they had told her that T.W. needed to contact the VA, and T.W. could not be enrolled until he came in.

T.W. also testified, explaining he had been at WSH for almost nine months and he felt he was ready to leave. T.W. felt that his emotions had stabilized, and he stated he would seek help if he started feeling stressed. T.W. was willing to stay with his mother until he could live independently. Prior to being committed, T.W. had never received mental health treatment. But at the hearing he testified that mental health treatment and counseling were important, he was

willing to remain on medication, and he would go straight to the VA to start receiving services if released. T.W. admitted that he was "a little reserved" with Dr. Collins, but he had tried to answer her questions truthfully and work with her. *Id.* at 89.

B. FINDINGS OF FACT & MOTION FOR REVISION

The commissioner found that T.W. was gravely disabled "as a result of a behavioral health disorder [and] manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over actions, [and] is not receiving such care as is essential for health and safety." Clerk's Papers (CP) at 46. Additionally, the commissioner found that T.W. had committed acts that constituted felony harassment and T.W. presented a substantial likelihood of repeating similar acts.

T.W. moved the superior court to revise the commissioner's ruling, arguing that there was insufficient evidence to establish that he was gravely disabled, committed a felonious act, or was likely to repeat a similar act. The superior court denied the motion, adopting the commissioner's findings of fact and conclusions of law.

T.W. appeals.

ANALYSIS

When a superior court receives a motion to revise a commissioner's ruling, "the superior court reviews both the commissioner's findings of fact and conclusions of law de novo based upon the evidence and issues presented to the commissioner." *State v. Ramer*, 151 Wn.2d 106, 113, 86 P.3d 132 (2004). If the superior court denies the motion to revise, then the superior court adopts the commissioner's findings of facts and conclusions of law. *Tedford v. Guy*, 13 Wn. App. 2d 1,

12, 462 P.3d 869 (2020). If the superior court's decision on revision is appealed, then we review the superior court's decision, not the commissioner's decision. *Ramer*, 151 Wn.2d at 113.

On sufficiency of the evidence challenges, we review the record to determine whether there is sufficient evidence to support the superior court's findings. *Id.* We will not overturn the superior court's findings, if the findings are supported by substantial evidence. *In re Det. of LaBelle*, 107 Wn.2d 196, 209, 728 P.2d 138 (1986). To commit someone for 90 or 180 days for being gravely disabled "the State must prove its case by clear, cogent[,] and convincing evidence." *Id.*; RCW 71.05.310. "[I]n other words, the findings must be supported by substantial evidence in light of the 'highly probable' test." *Id.* "Substantial evidence is 'evidence in sufficient quantum to persuade a fair-minded person of the truth of the declared premise.' " *In re Det. of A.S.*, 91 Wn. App. 146, 162, 955 P.2d 836 (1998) (quoting *Holland v. Boeing Co.*, 90 Wn.2d 384, 390, 583 P.2d 621 (1978)), *aff'd,* 138 Wn.2d 898, 982 P.2d 1156 (1999). Furthermore, on sufficiency of the evidence challenges, the evidence is read in a light most favorable to the prevailing party. *In re Det. of B.M.*, 7 Wn. App. 2d 70, 85, 432 P.3d 459 (2019).

I. GRAVELY DISABLED

T.W. argues that there was insufficient evidence to support the findings that he was gravely disabled.[2] We disagree.

---

[2] T.W. asserts that even though the period of involuntary commitment may have ended by the time of our review, his appeal is not moot. It is well established even if the treatment period has ended, because prior commitments may be considered in future commitment proceedings, appeals of involuntary commitment orders are not moot. *In re Det. of M.K.*, 168 Wn. App. 621, 629-30, 279 P.3d (2012).

A. LEGAL PRINCIPLES

An individual is "gravely disabled" if the individual "manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety." RCW 71.05.020(24)(b).[3] Under this prong, the State may involuntarily treat individuals who, after being released, stop taking their prescribed medication or drop out of therapy and their ability to function independently deteriorates rapidly. *LaBelle*, 107 Wn.2d at 206. However, this does not permit the State to involuntary commit an individual "solely because they are suffering from mental illness and may benefit from treatment." *Id.* at 207.

B. SUFFICIENT EVIDENCE TO SUPPORT COMMITMENT UNDER RCW 71.05.020(24)(b)

Here, there was sufficient evidence to establish that it is highly probable that T.W. would have deteriorated rapidly in the community and become unable to provide for his essential health if released. Dr. Collins believed that T.W. had impaired insight into his illness. T.W. had denied his symptoms at first and continued to minimize them, even though it appears he was still experiencing delusions a week before the hearing.

This impaired insight was further shown by T.W.'s reluctance to discuss his mental illness with providers or in group settings. T.W. would become frustrated when pressed about his delusions about satellites, and, at one point, he even walked out of a session. T.W. also had exhibited a loss of cognitive and volitional control. And T.W. was still experiencing delusions

---

[3] RCW 71.05.020 has been amended since March 2021. LAWS OF 2021, ch. 264 § 20, ch. 263, § 11. These legislative amendments do not make any material changes to this case. Accordingly, we cite to the most current version of the statute.

about satellites a week before the hearing. Without better insight into his illness, Dr. Collins was concerned whether T.W. would discontinue his medications if released because, initially, T.W. had indicated that he did not think he needed the medication and, closer to the hearing, he had reported the medication was not helping.

Accordingly, viewing the testimony in a light most favorable to the prevailing party, the State, there was sufficient evidence to find that T.W. was gravely disabled.

## II. FELONY-BASED CIVIL COMMITMENT

T.W. argues that the superior court erred in finding there was sufficient evidence to establish that he had committed acts constituting a felony and he was likely to repeat acts similar to felony harassment. We disagree.

## A. LEGAL PRINCIPLES

Under RCW 71.05.280(3), an individual may be committed for 180 days if that individual has been determined to be incompetent and criminal charges have been dismissed. The individual must have committed acts that constitute a felony and also have a mental disorder that "presents a substantial likelihood of repeating similar acts." RCW 71.05.280(3).

An individual is guilty of felony harassment if an individual threatens to kill another and by their words or conduct places the victim in reasonable fear that the threat will be carried out. RCW 9A.46.020; *State v. C.G.*, 150 Wn.2d 604, 610, 80 P.3d 594 (2003).

B.  ACTS THAT CONSTITUTE A FELONY

T.W. argues that there were insufficient facts to prove his felony harassment charge because there was no evidence that Rains was afraid that T.W.'s threat to kill would be carried out due to Rains' testimony that he was not afraid of T.W. once he armed himself.  We disagree.

The evidence shows that Rains was reasonably afraid that T.W. would carry out his threat to kill.  The State asked Rains whether T.W.'s threat caused Rains to be "in fear for your life." VRP (Mar. 4, 2021) at 14.  Rains responded, "I was." *Id.*  Rains also took actions consistent with his testimony: he armed himself, locked the doors, and contacted the police to give them T.W.'s location.  The evidence is sufficient to show that Rains was reasonably afraid that T.W. would attempt to carry out his threat, and, thus, sufficient for the crime of felony harassment.[4]

C.  SIMILAR ACTS

Next, T.W. argues that there was insufficient evidence to establish that there was a substantial likelihood that T.W. would repeat acts similar to felony harassment.  We disagree.

There was sufficient evidence that it was highly probable that there was a substantial likelihood of T.W. repeating acts similar to felony harassment.  Dr. Collins testified that she believed T.W. was likely to repeat similar acts.  She based her opinion on two incidents documented by the arresting officer and the fact that T.W. had harmed himself and threatened his mother.

---

[4] T.W.'s argument that Rains was not fearful *after* arming himself is misplaced.  Gauging the reasonableness of fear for the crime of felony harassment only after the victim arms themselves strains common sense.

Dr. Collins' ongoing concerns appeared rooted in T.W.'s poor insight into his illness. She noted that T.W. had exhibited frustration by yelling, cursing, and walking away especially when pressed about his thoughts about satellites. Dr. Collins noted that T.W. was still suffering from delusions about satellites. There was also the possibility that T.W. would stop treatment upon release and possibly decompensated again as a result because, according to Dr. Collins, T.W. did not believe his medication was helping and he was reluctant to discuss his symptoms.

At the time of T.W's arrest, he was suffering from these delusions about satellites. Considering the evidence of the continuation of these specific delusions, his reluctance to discuss them, and the risk of discontinuing of treatment if released, there is sufficient evidence to support Dr. Collins' professional opinion, and the superior court's finding, that there was a substantial likelihood of T.W. repeating similar acts.

## CONCLUSION

We conclude that there is sufficient evidence (1) to support the finding that T.W. was gravely disabled and (2) to impose a felony-based civil commitment. Accordingly, we affirm the superior court.

11

No. 55888-2-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, J.

We concur:

GLASGOW, C.J.

VELJACIC, J.