# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

In the Matter of the Detention of J.M.　　　)　　No. 73419-9-I
　　　　　　　　　　　　　　　　　　　)
STATE OF WASHINGTON,　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　　Respondent,　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　v.　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
J.M.,　　　　　　　　　　　　　　　　)　　UNPUBLISHED OPINION
　　　　　　　　　　　　　　　　　　　)
　　　　　　　　Appellant.　　　　　)　　FILED: April 18, 2016
_____)

VERELLEN, C.J. — J.M. challenges the trial court's 14-day involuntary treatment order, contending substantial evidence does not support the court's finding that he suffered from a grave disability. But the State presented evidence that J.M. could not provide for his essential needs of health and safety and that harmful consequences would likely follow if involuntary treatment was not ordered. We conclude substantial evidence supports the trial court's findings, and those findings in turn support its conclusion.

Therefore, we affirm.

## FACTS

On March 30, 2015, a designated mental health professional petitioned for J.M.'s initial detention, and he was detained. Navos Inpatient Services then filed a 14-day involuntary treatment petition, alleging that J.M. was gravely disabled due to a mental

disorder and, as a result, he "manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his/her actions and is not receiving such care as is essential for his/her health or safety."[1]

Kenneth Schoener, a Program for Assertive Community Treatment team member, and Dr. Julia Singer, a clinical psychologist, testified at the hearing.

Schoener testified that he has delivered psychiatric medication to J.M. for several years, but J.M. had stopped taking his medication a few months ago. As a result, J.M. has been completely off his medication for at least eight weeks. Schoener testified that J.M. was usually "a very quiet, easy-going individual; sometimes engaging" when on his medication. But since J.M. stopped taking his medication, he has been very angry "about 90% of the time" and unsafe.[2] About a week before the hearing, Schoener observed J.M. walk diagonally across a busy intersection into oncoming traffic.

Schoener also testified that J.M. exhibited "angry, threatening behavior" since being off his medication.[3] Schoener observed J.M. acting aggressively toward other residents at the complex. For example, he would knock on other residents' doors and as soon as someone opened their door, he would "push[] his way in, and take[] whatever he want[ed]."[4] J.M. was also aggressive towards Schoener.

Dr. Singer testified that J.M. suffers from schizoaffective disorder, causing substantial adverse effects on his cognitive and volitional functions. Dr. Singer testified that "the symptoms he presents with, currently, include . . . significant mood problems:

---

[1] Clerk's Papers (CP) at 22.

[2] RP (Apr. 3, 2015) at 7.

[3] Id. at 9.

[4] Id. at 10.

2

he is irritable, he is angry, he becomes agitated rather easily. He has a very intense affect. [H]e is clearly internally preoccupied at times, appearing to respond to internal stimuli. And his judgment and impulse control are impaired."[5]

Dr. Singer confirmed that J.M. was off his medication. She also testified that J.M. had "made it abundantly clear to all of us he has no intention of taking medications."[6] Dr. Singer indicated that when on his medication, J.M. was "more cooperative, sometimes engaging, pleasant, [and] quiet."[7] Since J.M. stopped taking his medication, Dr. Singer has "seen him go from reasonably calm and pleasant . . . on one contact; to being very angry, on another, a day later."[8]

Based on Dr. Singer's brief evaluation of J.M. that morning and Schoener's testimony at the hearing, Dr. Singer concluded that there had not been "any significant progress" in stabilizing J.M.[9] When asked what "harmful consequences" she foresaw if J.M. were not committed, Dr. Singer said "he will not take medications, and will continue to . . . deteriorate, continue to be aggressive, continue to do things like walking into traffic diagonally, across a busy intersection, without looking at anybody. . . . [H]e will be at risk of harm to himself."[10]

---

[5] Id. at 23.

[6] Id. at 31.

[7] Id. at 27.

[8] Id. at 25.

[9] Id.

[10] Id. at 30.

Dr. Singer concluded that J.M. was gravely disabled and that he showed severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive and volitional control over his actions. Therefore, outside a hospital setting, he would not receive the care essential to his health and safety. She recommended that J.M. be committed for up to 14, adding that a less restrictive alternative would not meet his needs.

The trial court granted the commitment petition, finding J.M. gravely disabled under RCW 71.05.020(17)(b).

J.M. appeals.

## ANALYSIS

The sole issue on appeal is whether the State presented substantial evidence to prove that J.M. was gravely disabled.[11] Our review is limited to determining whether substantial evidence supports the trial court's findings of fact and if those findings in turn support the court's conclusion.[12] "Substantial evidence is 'evidence in sufficient quantum to persuade a fair-minded person of the truth of the declared premise.'"[13]

Individuals may be involuntarily committed for up to 14 days if the State demonstrates by a preponderance of the evidence that, as a result of a mental disorder,

---

[11] Although J.M.'s commitment concluded long ago, J.M. contends, and the State concedes, that his appeal is not moot because an involuntary commitment order may have collateral consequences on future commitment determinations. See In re Det. of M.K., 168 Wn. App. 621, 625-30, 279 P.3d 897 (2012). Under the circumstances, we exercise our discretion to decide the appeal on the merits.

[12] In re Det. of LaBelle, 107 Wn.2d 196, 209, 728 P.2d 138 (1986).

[13] In re Det. of A.S., 91 Wn. App. 146, 162, 955 P.2d 836 (1998) (quoting Holland v. Boeing Co., 90 Wn.2d 384, 390, 583 P.2d 621 (1978)).

they present a likelihood of serious harm or are gravely disabled.[14] "Gravely disabled" means a person, as a result of a mental disorder, "manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety."[15] The State had to prove significant loss of cognitive or volitional control and a factual basis for concluding that J.M. is not receiving or would not receive, if released, the care essential for his health or safety.[16] The "evidence should indicate the harmful consequences likely to follow if involuntary treatment is not ordered."[17]

J.M. argues that care was merely beneficial and not essential to his health or safety, and that the State failed to demonstrate that harmful consequences were likely to recur without involuntary treatment.

The parties do not dispute J.M. suffered from a mental disorder at the time of his commitment. Substantial evidence in the record here supports that J.M. was gravely disabled by his disorder. Schoener testified that about a week before the commitment hearing, he observed J.M. walk diagonally across a busy intersection into oncoming traffic, "unaware of passing cars."[18] Both Schoener and Dr. Singer testified that, when on his medication, J.M. was cooperative, pleasant, quiet, and at times engaging. But since J.M. stopped taking his medication two months ago, he had "become increasingly

---

[14] RCW 71.05.240(3).

[15] RCW 71.05.020(17).

[16] LaBelle, 107 Wn.2d at 208.

[17] Id.

[18] RP (Apr. 30, 2015) at 7.

aggressive" towards staff and other residents.[19] Dr. Singer described J.M.'s behavior as "deteriorating over time."[20] She concluded that if J.M. was not committed, he would continue to "be at risk of harm to himself."[21] Further, Dr. Singer did not believe J.M. "would be guided, in any meaningful way, by a less restrictive order" at that time.[22] She indicated J.M. was "not stable enough to be guided by it; nor, is he stable to maintain safety, if we try sending him back out."[23]

Therefore, we conclude substantial evidence supports the court's findings that J.M. was not receiving care essential to his health or safety and that harmful consequences would likely follow if involuntary treatment was not ordered. And those findings support the court's conclusion that J.M. suffered from a grave disability.

We affirm the involuntary treatment order.

_____

WE CONCUR:

_____
Cox, J.

_____
Becker, J.

---

[19] Id. at 27.
[20] Id.
[21] Id. at 30.
[22] Id. at 31.
[23] Id.

6