# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | |
|---|---|
| In the Matter of the Detention of | No. 73818-6-I |
| BARRY ALAN SORRELS, | UNPUBLISHED OPINION |
| Appellant. | FILED: August 1, 2016 |

VERELLEN, C.J. — B.S. appeals a 90-day involuntary commitment order. He contends substantial evidence does not support the court's finding that he suffered from a grave disability. But the State presented recent, tangible evidence of B.S.'s inability to provide for his essential needs, with a high probability of serious physical harm within the near future unless adequate treatment was provided. We conclude substantial evidence supports the trial court's findings and those findings in turn support its conclusion. We therefore affirm.

## FACTS

After being voluntarily hospitalized at Harborview Medical Center from May 1, 2015 through May 22, 2015, B.S. was discharged to an adult family home. He was readmitted to Harborview on May 23, 2015.

On May 27, 2015, the State petitioned for B.S. to be committed for 14 days of involuntary treatment, and the court entered an agreed order.[1] The State then petitioned for 90 days of more restrictive involuntary treatment. The petition alleged B.S. was "gravely disabled" due to a mental disorder.[2]

The State presented testimony from Harborview Medical Center psychiatrist Dr. Kokil Chopra and Harborview social worker Ashely Molenda at the commitment hearing.

Dr. Chopra treated B.S. since his voluntary admission to Harborview. She performed a mental status exam of B.S. daily and reviewed nursing and other staff's overnight reports. Based on Dr. Chopra's evaluation, B.S. had mental, emotional, and organic impairments. He was diagnosed with major depressive disorder and cognitive disorder "not otherwise specified."[3] In addition, he had a history of chronic heroin use. Dr. Chopra stated these impairments had a substantial adverse effect on his cognitive and emotional function.

Dr. Chopra testified that upon B.S.'s May 23 readmission, he appeared "altered" mentally, declined to answer staff's questions, and repeatedly stated, "It's all the same," or "It doesn't matter," and "I do not want to do this anymore."[4] As for B.S.'s functioning since readmission, nursing reports indicated B.S. required a lot of assistance with his activities of daily living such as bathing and toileting. B.S. also

---

[1] A designated mental health professional previously petitioned for B.S.'s initial detention.

[2] Clerk's Papers (CP) at 24.

[3] Report of Proceedings (RP) (June 15, 2015) at 10.

[4] Id. at 18.

2

had balance problems. Staff reported he fell off a shower chair while bathing. And before his readmission, bystanders observed B.S. stumbling on the street. B.S. was supposed to use a walker, but sometimes walked on his own.

B.S. also had significant memory issues. Dr. Chopra testified that the week before the 90-day commitment hearing, B.S. did not remember her, even though she worked with him every weekday. She stated a lot of the time, he could not connect where he was or the day of the week and was unable to recall events occurring both before and after his previous discharge. B.S. also insisted he would return to his apartment if released, but B.S. did not have an apartment or the means to obtain one.

Dr. Chopra also testified B.S. suffered from other medical concerns, namely heart problems, which required a number of medications. Dr. Chopra doubted B.S. would be able to manage his medications or comply with medical appointments if released. In addition, toxicology testing indicated B.S. had used cocaine and opioids during his brief May 22 to May 23 release to an adult family home.

In Dr. Chopra's opinion, B.S. was gravely disabled as a result of a mental disorder; specifically, he was in danger of serious physical harm from a failure to provide for his essential needs of health and safety. She recommended B.S. remain at Harborview until they could find an adult family home or assisted living facility to provide him with the 24-hour supervision he needed to help manage his medications, cook his meals, and help him with his activities of daily living. Dr. Chopra testified B.S. was incapable of outpatient management given his memory impairments, and therefore, a less restrictive alternative placement was not appropriate.

Molenda testified that B.S. disagreed with Harborview about the proper placement for him. She stated his mental disorder interfered with the hospital's ability to develop a safe discharge plan for him because he lacked "insight into his illness and how it affect[ed] his ability to be safe in the community."[5] Molenda testified B.S. planned to go to his own apartment and stay in an independent setting after being discharged. But Molenda concluded B.S. was incapable of living on his own. She was concerned about his ability to attend necessary appointments, obtain medical care, and feed himself.

The court concluded B.S. was gravely disabled. The court found it significant that, after being released from the hospital for only one day, B.S. returned in an "altered" mental state, indicating he was suffering from depression and unable to take care of his daily needs.[6] The court therefore entered an order committing B.S. for an additional 90 days.

B.S. appeals.

<u>ANALYSIS</u>

As a preliminary matter, although the 90-day commitment order at issue has since expired, B.S. contends, and the State concedes, that his appeal is not moot because an involuntary commitment order may have collateral consequences on future commitment determinations.[7] Under the circumstances, we exercise our discretion to decide the appeal on the merits.

---

[5] Id. at 41.

[6] Id. at 52.

[7] See In re Det. of M.K., 168 Wn. App. 621, 625-30, 279 P.3d 897 (2012).

B.S. argues the trial court's findings of fact are not supported by substantial evidence, and these findings do not support its conclusion that B.S. was gravely disabled. We disagree.

A person can be committed for involuntary treatment if that person is gravely disabled.[8] Gravely disabled means a person, as a result of a mental disorder, "is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety."[9] The State must show "a substantial risk of danger of serious physical harm."[10] Specifically, "the State must present recent, tangible evidence of failure or inability to provide for such essential human needs as food, clothing, shelter, and medical treatment which presents a high probability of serious physical harm within the near future unless adequate treatment is afforded."[11] This risk of harm need not be evidenced by recent, overt acts.[12] Instead, it "usually arises from *passive* behavior—*i.e.*, the failure or inability to provide for one's essential needs."[13]

Where the trial court has weighed the evidence, our review is generally limited to determining whether substantial evidence supports the trial court's findings of fact and if those findings in turn support the court's conclusion.[14] Substantial evidence is

---

[8] RCW 71.05.280(4).

[9] RCW 71.05.020(17).

[10] In re Det. of LaBelle, 107 Wn.2d 196, 203-04, 728 P.2d 138 (1986).

[11] Id. at 204-05.

[12] Id. at 204.

[13] Id.

[14] Id. at 209.

'evidence in sufficient quantum to persuade a fair-minded person of the truth of the declared premise.'"[15]

For a 90-day involuntary commitment, the State must prove the individual is "gravely disabled" by clear, cogent and convincing evidence.[16] This standard of proof means the ultimate fact in issue must be shown by evidence to be "highly probable."[17]

Here, it is undisputed that B.S. suffered from serious, long-standing mental disorders at the time of his commitment. The State provided substantial evidence that B.S. was gravely disabled by those disorders. The State's witnesses testified that B.S.'s mental disorders significantly interfered with his self-care and the hospital's ability to develop a safe discharge plan for him. The fact that B.S. was readmitted to the hospital in an altered mental state after being discharged for just one day demonstrated that he lacked insight into his illness and how it affected his ability to be safe. B.S. also had significant memory issues and suffered from other medical concerns requiring multiple medications. If B.S. did not receive treatment in an inpatient setting, the State's witnesses' concluded he would be unable to take care of himself, decompensate "mentally, as well as physically," and be at risk for another stroke, heart problems, and other medical issues.[18] There is thus substantial

---

[15] In re Det. of A.S., 91 Wn. App. 146, 162, 955 P.2d 836 (1998) (quoting Holland v. Boeing Co., 90 Wn.2d 384, 390, 583 P.2d 621 (1978)).

[16] LaBelle, 107 Wn.2d at 209.

[17] Id.

[18] RP (June 15, 2015) at 20-21.

evidence that B.S. was in danger of serious physical harm due to a failure or inability to provide for his essential human needs.

B.S. claims any mental disorder he suffered from did not prevent him from meeting his essential needs because he was able to participate in self-care at Harborview and previously managed his own needs despite being homeless for 10 years. But the State was required only to show "a substantial *risk* of danger of serious physical harm."[19] Additionally, the State was not required to show the "danger of serious harm" was imminent.[20] Although Dr. Chopra testified B.S. was participating in self-care and meeting nutritional needs at Harborview, she clarified "participating in self-care need is different from [being] able to completely meet their own need. So he was participating, which means he's been cooperative in all the self-care . . . assistance that he gets."[21] Dr. Chopra further testified:

> The fact that he's meeting his nutritional goals is because he's in a structured setting right now. So things are monitored. If he stops eating, . . . the nurses will go to his room. . . . They'll prompt [him].
>
> . . . [T]he medications are provided. . . . I don't see [B.S.] taking that initiative to take his own medications. . . . [W]hat he's doing right now is because of this structured setting. And even now, . . . we are noticing a lot of deficits and impairments. So without a structured setting, he's bound to fail.[22]

---

[19] LaBelle, 107 Wn.2d at 204 (emphasis added).

[20] Id. at 203.

[21] RP (June 15, 2015) at 32.

[22] Id. at 35-36.

Therefore, although B.S. was able to participate in self-care *in* the hospital, the State established B.S. would be unable to provide for his essential needs *outside* a structured setting.

Furthermore, while B.S. had been homeless in the past, a homeless existence would present a grave risk of harm. Given his current medical issues, memory deficits, and inability to provide for his daily needs, only an inpatient facility can provide the supervision and assistance B.S. needs. Therefore, B.S.'s arguments are unpersuasive.

We affirm the 90-day involuntary commitment order.

WE CONCUR:

_____

_____                    _____