IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION ONE

| | |
|---|---|
| In the Matter of the Detention of | No. 88389-5-I |
| V.G., | |
| Appellant. | UNPUBLISHED OPINION |

BOWMAN, A.C.J. — V.G. appeals the trial court's order committing him for 14 days of involuntary treatment. He argues the court's findings are insufficient for meaningful appellate review and do not support its conclusion that he is gravely disabled. Because the trial court's findings are sufficient for appellate review and adequately support its conclusion that V.G. is gravely disabled under RCW 71.05.020(25)(b), we affirm.

FACTS

On June 9, 2025, police took V.G. to an emergency room based on his suicidal and homicidal ideations. On June 16, 2025, Skagit Valley Hospital (SVH) petitioned under chapter 71.05 RCW to commit V.G. for 14 days of involuntary treatment. SVH alleged that V.G. has bipolar I disorder and is "currently severely manic." It alleged he presents a likelihood of serious harm and is gravely disabled. It also alleged that V.G. presents with, among other things, "restless energy, euphoric mood, distractibility, overly goal directed activity, no insight into his mental health, [and] pressured speech." It said V.G. "continues to refuse medication" and "is not ready for safe discharge."

On June 17 and 18, 2025, a court commissioner held a probable cause hearing on SVH's 14-day involuntary treatment petition. V.G.'s brother, Derrill Gifford, testified on behalf of SVH. He testified that V.G. was the "sweetest boy, young man," but that Gifford and his family have been concerned about V.G.'s mental health for several years. Gifford testified that their father died in 2022 and the family tried to probate the father's estate. And during the probate process, V.G. became more unreasonable, angry, and threatening. Gifford testified that as a result, he and his sister obtained a protection order against V.G. and have had no contact with him for over a year. Gifford said he last saw V.G. about a week earlier at a hearing related to their father's estate and V.G. made suicidal and homicidal statements. Gifford testified that V.G.'s statements made him fearful and "very concerned."

Psychiatrist Dr. Eric Larson also testified for SVH. Dr. Larson said he had been meeting daily with V.G. since June 14, 2025. He opined that V.G. has "bipolar I disorder, currently manic, with mixed and psychotic features." Dr. Larson explained that V.G. is paranoid, struggles with distractibility, has racing thoughts, makes odd associations, and lacks insight. And he testified that he had observed no improvements in V.G.'s symptoms. Dr. Larson said V.G. disagrees with the bipolar diagnosis.

Dr. Larson also testified that V.G. admitted to making recent suicidal and homicidal statements but has not continued endorsing the statements. When asked about V.G's "self-care," Dr. Larson said that when he first started seeing V.G., V.G. was on a "hunger strike" and refused to eat for almost 24 hours. But

2

since then, V.G. has been eating, sleeping between 6 and 7 hours, and generally appears "clean and well-groomed." Still, Dr. Larson opined that V.G. has severely deteriorated from his baseline, experienced a loss of cognitive intuition and control, and cannot provide for his own health and safety. Dr. Larson added that V.G. has been "slowly decompensating in . . . the community." He said that without treatment, he is concerned V.G.

> would end up discharging, continue to be paranoid, continue to . . . struggle with impulse control, to struggle with these internal drives, and then . . . take the advice of [his] girlfriend to self-medicate his disorder with cannabis.

V.G. called his girlfriend, Meg Duke, to testify. She testified that V.G.'s behavior had been "fairly consistent" over the last six months. She said her concern was "the amount of stress [V.G.] has been under for multiple years" because of his involvement in several court cases. Duke testified she does not believe V.G. needs to be hospitalized, and she has "a deep concern that his stay in the hospital is exacerbating his stress and his physiological symptoms." V.G's friend Kelly Jo Legaz also testified. Legaz testified that she has observed nothing concerning about V.G.'s mental health. She also testified that she believes V.G. can safely live independently and does not need medication.

V.G. testified on his own behalf. He said he believes he is "suffering from complex post-traumatic stress disorder due to . . . having extremely high anxiety while trying to deal with my legal issues that have been imposed upon me in the form of abuse of process." He testified that he does not believe he has a mental health issue requiring medication. And he has no plans to seek therapy because he cannot pay, and his friends are his counselors. V.G. testified that he does not

3

intend to harm his family and is ready to leave the hospital. He said he believed that Dr. Larsen and his manager "purposefully have withheld my right to access my documents in an attempt to misdiagnose me and triple the money that they get from the [s]tate in the form of insurance to unjustly enrich themselves."

The commissioner then gave her oral ruling. She found that V.G. has "bipolar I manic disorder with [mixed] psychiatric features." She also found that V.G. is normally a kind and courteous person but has not been at his baseline since before 2018. She found that V.G. has racing thoughts, odd associations, lacks insight into his mental health issues, and lacks an understanding of how much they affect his entire life. The commissioner refused to find that V.G. was a danger to himself or others but found that V.G. is "fail[ing] to provide for [his] health and safety" and having "a severe deterioration in routine functioning." The commissioner concluded that V.G. was gravely disabled. She determined that a less restrictive alternative was not available and ordered 14 days of involuntary treatment.

On June 18, 2025, the commissioner entered written findings of fact and conclusions of law, incorporating by reference her oral findings and conclusions. In the written order, the commissioner found that V.G. had bipolar I disorder and, as a result, was gravely disabled. The commissioner failed to identify whether V.G. was gravely disabled under RCW 71.05.020(25)(a) or (b). She documented these facts in support of her conclusion that V.G. was gravely disabled:

> Brother testified to baseline, and last time [V.G.] was baseline in 2018, at that time [V.G.] had suicidal ideation [and] later issues when father died. At protective order hearing, brother testified to suicidal [and] homicidal ideation[.] [O]ther symptoms testified to

4

include grandiose thoughts [and] paranoia, racing thoughts, odd associations of thought[,] pressured speech, inappropriate smiling when talking about paranoia [and] depression. At baseline he's sweet, loving heart, involved [with] family. He denies need for treatment, is not stabilized. He does not have an outpatient treatment provider. Lacks insight into his mental health issue [and] how it affects his life.

The commissioner ordered 14 days of involuntary treatment.

V.G. appeals.

ANALYSIS

V.G. argues the trial court's findings of fact are insufficient for meaningful appellate review and do not support its conclusion that he is gravely disabled under RCW 71.05.020(25). We disagree.

1. Appellate Review

As an initial matter, V.G. argues the trial court's written findings of fact are insufficient for appellate review.[1] We disagree.

Generally, when findings are required, they must be specific enough to allow meaningful review. *In re Det. of LaBelle*, 107 Wn.2d 196, 218, 728 P.2d 138 (1986). To be sufficiently specific, the findings should indicate the facts supporting the conclusions. *In re Det. of G.D.*, 11 Wn. App. 2d 67, 69, 450 P.3d 668 (2019). Findings may be sufficient even if they are implicit in the court's written findings of facts. *In re Det. of A.F.*, 20 Wn. App. 2d 115, 123, 489 P.3d 1006 (2021). Written findings are insufficient on their own when their language is standardized and they fail to show the factual bases for a conclusion, like that a person is gravely disabled. *LaBelle*, 107 Wn.2d at 219-20. Even so, "written

---

[1] The parties agree that V.G.'s appeal is not moot.

findings may be supplemented by the trial court's oral decision or statements in the record." *Id.* (determining that the court's insufficient written findings are not "fatal" because the record in its entirety shows the factual bases underlying its conclusion).

Here, the trial court's written order found that V.G. has bipolar disorder and is gravely disabled as a result. While the court did not indicate in writing which alternative statutory definition of "gravely disabled" it relied on, *see* RCW 71.05.020(25), it provided facts supporting its conclusion. Under the court's "gravely disabled" conclusion, it documented that V.G. is no longer at his baseline, has behavioral health disorder symptoms, denies the need for treatment, is not stabilized, and lacks insight into the effects of his mental health disorder. In the court's oral decision, it recited supporting facts from witness testimony that it found reliable. It then stated, among other things, "I believe that this is a failure to provide for health and safety. I believe that there is a severe deterioration in routine functioning."

The trial court's findings provide the factual basis for its conclusion that V.G. was gravely disabled and are sufficient to permit meaningful review.

2. Gravely Disabled

V.G. argues that the trial court's findings do not support its conclusion that he is gravely disabled under RCW 71.05.020(25)(b).[1] We disagree.

---

[1] V.G. also argues there is insufficient evidence to support that he is gravely disabled under RCW 71.05.020(25)(a). But the State concedes that issue. We accept the State's concession and do not address the argument.

We review an involuntary commitment order to determine whether substantial evidence supports the trial court's findings of fact and whether those findings support its conclusions of law. *LaBelle*, 107 Wn.2d at 209. "Substantial evidence" is evidence sufficient " 'to persuade a fair-minded person of the truth of the declared premise.' " *In re Det. of A.S.*, 91 Wn. App. 146, 162, 955 P.2d 836 (1998) (quoting *Holland v. Boeing Co.*, 90 Wn.2d 384, 390-91, 583 P.2d 621 (1978)), *aff'd*, 138 Wn.2d 898, 982 P.2d 1156 (1999). Unchallenged findings of fact are verities on appeal. *In re Det. of L.S.*, 23 Wn. App. 2d 672, 686, 517 P.3d 490 (2022).

Involuntary commitment for behavioral health disorders "is a significant deprivation of liberty which the State cannot accomplish without due process of law." *LaBelle*, 107 Wn.2d at 201. To involuntarily commit a person for 14 days, the court must find by a preponderance of the evidence that

> [the] person detained for behavioral health treatment, as the result of a behavioral health disorder, presents a likelihood of serious harm, or is gravely disabled, and, after considering less restrictive alternatives to involuntary detention and treatment, finds that no such alternatives are in the best interests of such person or others.

RCW 71.05.240(4)(a).

Under chapter 71.05 RCW, "gravely disabled" means

> a condition in which a person, as a result of a behavioral health disorder: (a) Is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional

7

control over his or her actions and is not receiving such care as is essential for his or her health or safety.

RCW 71.05.020(25). Evidence that a person is gravely disabled under subsection (b) of the statute "must include recent proof of significant loss of cognitive or volitional control." *LaBelle*, 107 Wn.2d at 208. And the evidence must give a factual basis for concluding that the person "is not receiving or would not receive, if released, such care as is essential for his or her health or safety." *Id.* It is not enough to show that treatment would be in the person's best interest. *Id.* Instead, the evidence must show that involuntary treatment is "*essential* to an individual's health or safety," and it should show "the harmful consequences likely to follow" if the court does not order the treatment. *Id.* In sum, the individual must be "*unable*, because of severe deterioration of mental functioning, to make a rational decision with respect to his need for treatment." *Id.*

Here, the trial court found that V.G. has bipolar I disorder. It also found that he has grandiose thoughts, paranoia, racing thoughts, odd associations of thought, pressured speech, and inappropriate smiling when talking about paranoia and depression. It found that V.G. has had "severe deterioration in [his] routine functioning." And he is unstable, lacks insight into his behavioral health disorder, and denies a need for treatment. The court stated that V.G. is "fail[ing] to provide for [his own] health and safety." And it relied on Dr. Larson's testimony, who did not believe V.G. can provide for his own health or safety outside the hospital. These findings adequately support the trial court's conclusion that V.G. is gravely disabled under RCW 71.05.020(25)(b).

8

Because the trial court's findings support its conclusion that V.G. is gravely disabled, we affirm the 14-day involuntary commitment order.

_____, ACJ

WE CONCUR:

_____          _____