IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| In the Matter of the Detention of | No. 88111-6-I |
|---|---|
| C.L., | |
| | UNPUBLISHED OPINION |
| Appellant. | |

BOWMAN, A.C.J. — C.L. challenges the trial court's order revoking his less restrictive alternative treatment (LRA). Because substantial evidence supports the trial court's finding that C.L. suffered a substantial decompensation with a reasonable probability that the decompensation could be reversed with further inpatient treatment, we affirm.

FACTS

In January 2025, C.L.'s mother brought him to Connections Kirkland crisis care center to address concerns with his mental health. After evaluation, a designated crisis responder (DCR) petitioned for C.L. to be involuntarily detained. The DCR stated that C.L. presented with a behavioral health disorder characterized by "disorganization, religious preoccupations, responding to internal stimuli, increased impulsivity, limited insight, and limited judgment."

On January 10, Connections petitioned for C.L. to be involuntarily detained for up to 14 days, alleging that C.L. was gravely disabled. On February 12, C.L. agreed to a 90-day LRA in lieu of a 14-day detention. He stipulated that sufficient facts showed he was gravely disabled. As to the terms and conditions of the LRA, the court ordered that C.L. reside with his mother in Seattle, attend

all appointments and follow all treatment recommendations, and refrain from "acts, attempts, and threats of harm to self, others, and others' property."

On March 19, C.L. asked his mother to take him back to Connections. Connections readmitted C.L. and then discharged him on April 15. But several days later, C.L. again asked to return to Connections because he had not slept for four days, was experiencing paranoia, and felt unsafe. C.L.'s mother brought him back to Connections on April 24.

The same day, a DCR petitioned for revocation of C.L.'s LRA. The petition alleged that C.L. (1) failed to adhere to the terms and conditions of his February LRA, (2) demonstrated a substantial deterioration in functioning, (3) showed evidence of substantial decompensation with a reasonable probability that the decompensation could be reversed by further inpatient treatment, and (4) posed a likelihood of serious harm.

The court held a revocation hearing on April 30. C.L.'s mother testified at the hearing. She said that C.L. has been struggling with mental health issues for more than three years. At his baseline, C.L. is respectful, outgoing, sociable, and not aggressive toward others. She explained that C.L. asked her to bring him back to Connections in late April because he had not slept for the four days he was home. She also said that C.L. was deteriorating and acting paranoid.

Hyemin Song, a court evaluator and licensed clinical social worker, also testified. Song was familiar with C.L. from his prior hospitalizations. And she interviewed C.L. both on April 15, before he was discharged from Connections, and again on April 28, after he returned.

Song testified that C.L. suffers from schizoaffective disorder, bipolar type. When C.L. arrived at the hospital on April 24, staff noted he was severely agitated, disorganized, psychotic, and threatening. He threatened to spit on staff members and threatened another patient, saying, " '[W]ant to go?' " The next day, C.L. walked toward a staff member, started yelling, took off his shirt, and got in a fighting stance. On April 26, he pushed another patient's head against a phone and hit him. And on April 28, he exhibited inappropriate behavior, such as " 'anatagoniz[ing] others by clapping in their face and laughing," making "inappropriate comments" toward staff, and running and hitting exit signs.

Song explained that during the April 28 interview, C.L. presented as "a bit more symptomatic and decompensated" compared to April 15. C.L. "mumbl[ed] a lot under his breath," did not coherently answer questions, and was "tangential in his speech." Song said C.L.'s mood was pleasant and cooperative and he tried to engage in the interview, but his ability appeared limited because of "internal preoccupation," to the point that he could not coherently engage with her.

Based on her interviews and a review of his chart notes, Song opined that C.L. exhibited a substantial decompensation in functioning with a reasonable possibility that the decompensation could be reversed by further inpatient treatment. She explained that he exhibited many of the same schizoaffective disorder symptoms as he did during prior hospitalizations. She said that C.L. showed signs of improvement during hospitalization and that she believed he could be restored to his baseline level of functioning after continued treatment.

But she was concerned that he was still showing signs of severe agitation, aggression, and poor impulse control on April 28, just two days before the hearing.

The trial court found that clear and cogent evidence established that C.L. violated the terms and conditions of his February LRA, suffered a substantial decompensation with a reasonable probability that the decompensation could be reversed by further inpatient treatment, and posed a likelihood of serious harm. Based on its findings of fact, the trial court revoked C.L.'s LRA and ordered that he be returned to Connections for further inpatient treatment.

C.L. appeals.

## ANALYSIS

C.L. argues that the trial court erred by relying on evidence of his aggressive behavior at the hospital to show he violated the terms and conditions of his LRA. We decline to address C.L.'s argument because substantial evidence supports the trial court's other basis for revoking his LRA—that C.L. was decompensating and that it was reasonably probable the decompensation could be reversed with further inpatient treatment.

For an involuntary commitment order, we review whether substantial evidence supports the court's findings of fact and whether those findings support its conclusions of law. *In re Det. of LaBelle*, 107 Wn.2d 196, 209, 728 P.2d 138 (1986). "Substantial evidence" is evidence sufficient " 'to persuade a fair-minded person of the truth of the declared premise.' " *In re Det. of A.S.*, 91 Wn. App. 146, 162, 955 P.2d 836 (1998) (quoting *Holland v. Boeing Co.*, 90 Wn.2d 384,

390-91, 583 P.2d 621 (1978)), *aff'd*, 138 Wn.2d 898, 982 P.2d 1156 (1999).

Unchallenged findings of fact are verities on appeal. *In re Det. of L.S.*, 23 Wn.

App. 2d 672, 686, 517 P.3d 490 (2022).

Under RCW 71.05.590, a court must engage in a two-step process when

determining whether to revoke an LRA. *See* RCW 71.05.590(5)(b), (d). First,

the court must determine whether

> (i) [t]he person adhered to the terms and conditions of the order; (ii)
> substantial deterioration in the person's functioning has occurred;
> (iii) there is evidence of substantial decompensation with a
> reasonable probability that the decompensation can be reversed by
> further inpatient treatment; or (iv) there is a likelihood of serious
> harm.

RCW 71.05.590(5)(d). If the court determines that any of those conditions apply,

it must then decide whether to reinstate or modify the person's LRA or order the

person detained for inpatient treatment. *Id.*

Here, the court found that C.L. suffered substantial decompensation with a

reasonable probability that the decompensation could be reversed by further

inpatient treatment. Substantial evidence supports that finding.

At the revocation hearing, court evaluator Song testified that C.L. suffers

from schizoaffective disorder, bipolar type. She testified that when C.L. had

previously been admitted to the hospital, he was calm and nonaggressive toward

others. C.L.'s mother also testified that at his baseline, C.L. is respectful,

outgoing, sociable, and not aggressive toward others. But Song explained that

C.L. engaged in threatening and aggressive behavior while in the hospital,

including assaulting another patient on April 26. She said that he exhibited many

of the same symptoms of his schizoaffective disorder during his three prior

hospitalizations. And C.L. showed signs of improvement during hospitalization, so she believed he could be restored to his baseline level of functioning with further treatment.

C.L. does not challenge the court's finding of substantial decompensation. Still, he argues we should address his challenge to the court's finding that he violated the terms of the LRA because the court did not suggest it would revoke the LRA based on a finding of only substantial decompensation. But the record does not support C.L.'s argument. The court explained that it would not be in C.L.'s best interest to modify or reinstate his LRA, "as his symptoms are similar to past cycles of decompensation that led to hospitalizations." And inpatient treatment is required, "particularly in light of [C.L.]'s prior rapid decompensation and re-hospitalization between April 16 [and] 24."

Because substantial evidence supports the trial court's finding that C.L. suffered substantial decompensation with a reasonable probability that the decompensation could be reversed with further inpatient treatment, we affirm the court's order revoking his LRA.

_____, ACJ

WE CONCUR:

_____          _____

6